# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTIST PUBLISHING GROUP, LLC d/b/a APG, a Delaware Limited Liability Company; FIRST-N-GOLD PUBLISHING, INC., a Florida Corporation; LUKASZ GOTTWALD, an individual doing business as KASZ MONEY PUBLISHING; KMA ASSETS I LP, a Delaware Limited Partnership; KMA ASSETS II LIMITED, a United Kingdom Private Limited Company; KOBALT MUSIC PUBLISHING AMERICA, INC. d/b/a KMPA, a Delaware Corporation; MXM MUSIC AB d/b/a MXM, a Swedish Limited Liability Company; NOTTING HILL MUSIC, INC., a New York Corporation; and PRESCRIPTION SONGS, LLC, a California Limited Liability Company, <br><br>        Plaintiffs, <br><br>            v. <br><br> ORLANDO MAGIC, LTD. d/b/a ORLANDO MAGIC, a Florida Limited Partnership; and DOES 1-10, inclusive, <br><br>        Defendants. | Case No: 1:24-CV-05461-JSR |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND DEFENDANT'S ADDITIONAL STATEMENT OF FACTS IN RESPONSE

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant Orlando Magic, Ltd. submits this Response to the Statement of Material Facts filed by Plaintiffs Artist Publishing Group, LLC, First-N-Gold Publishing, Inc., Lukasz Gottwald dba Kasz Money Publishing, KMA Assets I LP, KMA Assets II Limited, Kobalt Music Publishing America, Inc. dba KMPA, MXM Music AB dba MXM,

Notting Hill Music, Inc., and Prescription Songs, LLC (collectively "Plaintiffs") (Doc. 47), and adds additional statements of fact in response.[1]

1.      Plaintiffs are music publishers and administrators who control an extensive catalog of musical compositions. [Declaration of Brett Copell ("APG Decl."), *see generally* UU 250; Declaration of Ted Lucas ("FNG Decl."), *see generally* UU 4-12; Declaration of Andy McQueen ("Notting Hill Decl."), *see generally* UU 3-12; Declaration of Tomas Ljung ("MXM Decl."), *see generally* UU 3-10; Declaration of Lukasz Gottwald ("Kasz Money Decl."), *see generally* UU 3-4; Declaration of Diana Sanders ("Prescription Decl."), *see generally* UU 3-10; Declaration of James Arnay ("Arnay Decl."), UU 3-4; Declaration of Jon Trumbull ("Trumbull Decl."), UU 3-4.]

RESPONSE:  **Admitted**

2.      Of that catalog, 27 distinct compositions (the "Subject Works") are at issue in this dispute and cataloged in exhibit 1 to the First Amended Complaint (Dkt. 40). [*See* First Amended Complaint, ECF No. 40 ("FAC"), U 1, Exh. 1.]

RESPONSE:  **The Magic admits that 27 distinct compositions are it issue in this dispute but denies that Plaintiffs have sufficiently proven their ownership interests in those songs. Plaintiffs do not offer competent summary judgment evidence of their percentage ownership of the songs and much of the evidence on which Plaintiffs rely is inadmissible, including the defective declarations of Brett Copell/Caitlyn Miles (Docs. 48, 64), Diana Sanders (Docs. 54, 68), and James Arnay (Docs 50, 66).**

---

[1] Cites to lettered exhibits are references to the exhibits attached to the Supplemental Declaration of Benjamin T. Pendroff being filed contemporaneously herewith.

3.     Defendant owns and operates the National Basketball Association team, the Orlando Magic. [*See* Defendant's Answer to Complaint (Dkt. 21), U 19.]

RESPONSE:  **Admitted**

4.     [Intentionally Omitted]

RESPONSE:  **No response required.**

5.     [Intentionally Omitted]

RESPONSE:  **No response required.**

6.     Plaintiffs own the copyrights in the Subject Works. [APG Decl., ¶¶ 3-5, Exh. 1 (Boyfriend); ¶¶ 6-10, Exh. 2-3 (Fantasy); ¶¶ 11-13, Exh. 4 (Fireball); ¶¶ 14-22, Exh. 5-9 (GDFR); ¶¶ 23-30, Exh. 10-14 (I Cry); ¶¶ 31-33, Exh. 15 (No Idea); ¶¶ 34-37, Exh. 16 (See You Again); ¶¶ 38-40, Exh. 17 (Shawty Got Moves); ¶¶ 41-43, Exh. 18 (Type of Way); ¶¶ 44-46, Exh. 19 (Want to Want Me); ¶¶ 47-50, Exh. 20 (We Own It); FNG Decl., ¶¶ 3-5, Exh. 1-2 (All I Do Is Win); ¶¶ 6-8, Exh. 3 (All the Way Up); ¶¶ 9-10, Exh. 1-2 (I'm A Boss); Notting Hill Decl., ¶¶ 3-5, Exh. 1 ((I Know I Got) Skillz); ¶¶ 6-8, Exh. 2-5 (A Little Party Never Killed Nobody (All We Got)); ¶¶ 9-11, Exh. 6-8 (All I Do Is Win); MXM Decl., ¶¶ 3-6, Exh. 1 (…Baby One More Time); ¶¶ 7-8, Exh. 1 (Hot N Cold); ¶¶ 10-11, Exh. 1 (It's Gonna Be Me); Kasz Money Decl., ¶¶ 1, 3; Prescription Decl., ¶ 3, Exh. 1 (Boys); ¶ 4, Exh. 2 (Don't Start Now); ¶ 5, Exh. 3 (Lean On); ¶¶ 6-7, Exh. 4-5 (Tik Tok); ¶7, Exh. 5 (My First Kiss); ¶8, Exh. 6-7 (Girls Like You) and (Time of Our Lives); ¶9, Exh. 8 (Hot N Cold); Arnay Decl., ¶¶ 10, 15, Exh. 5, 10.]

RESPONSE:  **The Magic admits that some Plaintiffs have some ownership interest in the Subject Works but denies this statement to the extent that Plaintiffs have not included competent summary judgment proof of their percentage of ownership in the Subject Works. The Magic further denies this statement with respect to Plaintiffs APG, Prescription, KMA**

**Assets I LP, and KMA Assets II Limited because, as described below, they have not
submitted competent summary judgment evidence of their ownership of the Subject Works.**

7.      Artist Publishing Group, LLC entered into exclusive co-publishing agreements
with songwriters Mason David Levy, Kevin Clark White, Michael Clinton Woods, Andrew Nabeel
Bazzi, Andreas Schuller, Justin Scott Franks, Michael Caren, Andrew Martin Cedar, Paulo Ytienza
Rodrigues, Raphael Jurdin, Alex Schwartz, Joseph Khajadourian, Pierre-Antoine Joseph Michel
Melki, Caleb Zackery Toliver, Charlie Otto Puth, Willie C. Poole, Lionel Cart, Samuel Denison
Martin, Breyan Stanley Isaacs, for their respective rights in the Subject Works, "Boyfriend,"
"Fireball," "GDFR," "I Cry," "No Idea," "See You Again," "Shawty Got Moves," "Type of Way,"
"Want To Want Me," "We Own It," and "Fantasy." [APG Decl., ¶¶ 3-5, Exh. 1 (Boyfriend); ¶¶ 6-
10, Exh. 2-3 (Fantasy); ¶¶ 11-13, Exh. 4 (Fireball); ¶¶ 14-22, Exh. 5-9 (GDFR); ¶¶ 23-30, Exh.
10-14 (I Cry); ¶¶ 31-33, Exh. 15 (No Idea); ¶¶ 34-37, Exh. 16 (See You Again); ¶¶ 38-40, Exh. 17
(Shawty Got Moves); ¶¶ 41-43, Exh. 18 (Type of Way); ¶¶ 44-46, Exh. 19 (Want to Want Me); ¶¶
47-50, Exh. 20 (We Own It).]

RESPONSE:  **The Magic denies APG's ownership in the Subject Works listed above
because APG has failed to submit competent summary judgment evidence of such
ownership. APG submitted a declaration purporting to prove APG's ownership of the
Subject Works (Docs. 48 and 64), however, the declarations submitted on behalf of APG are
defective because the named Declarant is Brett Copell but the declarations were signed by
Caitlyn Miles. Accordingly, there is no admissible evidence in Plaintiffs' Motion proving
APG's ownership in the above Subject Works. The Magic further denies this statement
because Plaintiffs lack competent summary judgment evidence of APG's percentage
ownership of the Subject Works.**

8.    First-n-Gold Publishing Inc. entered into agreements with songwriters William Roberts and Shandel Green for exclusive rights and ownership in the works "All The Way Up," "I'm A Boss," and "All I Do Is Win." [FNG Decl., ¶¶ 3-5, Exh. 1-2 (All I Do Is Win); ¶¶ 6-8, Exh. 3 (All the Way Up); ¶¶ 9-10, Exh. 1-2 (I'm A Boss).]

RESPONSE:  **The Magic admits that First-n-Gold Inc. entered into agreements with William Roberts and Shandel Green related to the above Subject Works but denies that the agreements gave First-n-Gold Publishing Inc. exclusive rights and ownership in the works because Plaintiffs did not submit competent summary judgment evidence that First-n-Gold had complete and exclusive ownership in the Subject Works.**

9.    Notting Hill Music, Inc. entered into agreements with songwriters Cecil Demetrius Womack, Francesca Maeondra Richard, and Khaled Mohammed Khaled for exclusive rights in the works "A Little Party Never Killed Nobody (All We Got)," "(I Know I Got) Skillz," and "All I Do Is Win." [Notting Hill Decl., ¶¶ 3-5, Exh. 1 ((I Know I Got) Skillz); ¶¶ 6-8, Exh. 2-5 (A Little Party Never Killed Nobody (All We Got)); ¶¶ 9-11, Exh. 6-8 (All I Do Is Win).]

RESPONSE:  **The Magic admits that Notting Hill Music, Inc. entered into agreements with Cecil Demetrius Womack, Francesca Maeondra Richard, and Khaled Mohammed Khaled related to the above Subject Works but denies that the agreements gave Notting Hill Music, Inc. exclusive rights in the works because Plaintiffs did not submit competent summary judgment evidence proving that Notting Hill Music, Inc. had complete and exclusive ownership in the Subject Works.**

10.    MXM Music AB entered into an agreement with songwriter Max Martin for exclusive rights to "…Baby One More Time," "It's Gonna Be Me," and "Hot n Cold." [MXM

Decl., ¶¶ 3-6, Exh. 1 (…Baby One More Time); ¶¶ 7-8, Exh. 1 (Hot N Cold); ¶¶ 10-11, Exh. 1 (It's Gonna Be Me).]

RESPONSE:  **The Magic admits that MXM Music AB entered into an agreement with Max Martin related to the above Subject Works but denies that the agreements gave MXM Music AB exclusive rights in the works because Plaintiffs did not submit competent summary judgment evidence proving that MXM Music AB had complete and exclusive ownership in the Subject Works.**

11.    Lukas Gottwald, doing business as Kasz Money Publishing, is the co-writer and owner of the copyrights as an author for the works "My First Kiss," "Tik Tok," "Time of Our Lives," and "Hot n Cold." [Kasz Money Decl., ¶¶ 1, 3.]

RESPONSE:  **Admitted**

12.    Prescription Songs, LLC entered into agreements with songwriters Aaron Jennings Puckett, Emily Schwartz, Katy Perry, Philip Meckspecker, Benjamin Joseph Levin, and Kesha Sebert for exclusive rights in "Boys," "Don't Start Now," "Girls Like You," "Lean On" "My First Kiss," "Tik Tok," "Time of Our Lives," and "Hot n Cold." [Prescription Decl., ¶ 3, Exh. 1 (Boys); ¶ 4, Exh. 2 (Don't Start Now); ¶ 5, Exh. 3 (Lean On); ¶¶ 6-7, Exh. 4-5 (Tik Tok); ¶7, Exh. 5 (My First Kiss); ¶8, Exh. 6-7 (Girls Like You) and (Time of Our Lives); ¶9, Exh. 8 (Hot N Cold).]

RESPONSE:  **The Magic admits that Prescription Songs, LLC entered into agreements with Aaron Jennings Puckett, Emily Schwartz, Katy Perry, Philip Meckspecker, Benjamin Joseph Levin, and Kesha Sebert related to the above Subject Works but denies that the agreements gave Prescription Songs, LLC exclusive rights in the Subject Works because Plaintiffs did not submit competent summary judgment evidence proving that Prescription Songs, LLC had complete and exclusive ownership in the Subject Works.**

**Furthermore, the Declaration of Diana Sanders (Docs. 54, 68) purporting to attribute the above Subject Works to the above-named authors contains statements on "information and belief" but not on the declarant's personal knowledge, rendering her declaration defective.**

13.     KMA Assets I LP obtained rights through a purchase agreement in the works "A Little Party Never Killed Nobody (All We Got)." [Arnay Decl., ¶ 15, Exh. 10.]

<u>RESPONSE:</u>  **The Magic denies this statement because Paragraph 15 of the Arnay declaration (Docs. 50, 66) states that KMSA, not KMA Assets I LP entered into an asset purchase agreement and KMA Assets I LP is not a party to the Asset Purchase Agreement at Exhibit 10 (Doc. 66-10), therefore there is no competent summary judgment evidence proving this statement.**

14.     KMA Assets II Limited obtained rights through a purchase agreement in "I Love It (feat. Charli XCX)." [Arnay Decl., ¶ 10, Exh. 5.]

<u>RESPONSE:</u>  **The Magic denies this statement because Paragraph 10 of the Arnay declaration (Docs. 50, 66) states that KMSL, not KMA Assets II Limited, entered into an asset purchase agreement and KMA Assets II Limited is not a party to the Asset Purchase Agreement at Exhibit 5 (Doc. 66-5), therefore there is no competent summary judgment evidence proving this statement.**

15.     The Subject Works are registered with the United States Copyright Office. [Declaration of Jon Trumbull ("Trumbull Decl."), ¶¶ 5-7, Exh. 1 ((I Know I Got) Skillz); ¶¶ 8-10, Exh. 2 (…Baby One More Time); ¶¶ 11-13, Exh. 3 (A Little Party Never Killed Nobody (All We Got)); ¶¶ 14-16, Exh. 4 (All I Do Is Win); ¶¶ 17-19, Exh. 5 (All the Way Up); ¶¶ 20-22, Exh. 6 (Boyfriend); ¶¶ 23-25, Exh. 7 (Boys); ¶¶ 26-28, Exh. 8 (Don't Start Now); ¶¶ 29-31, Exh. 9 (Fantasy); ¶¶ 32-34, Exh. 10 (Fireball); ¶¶ 35-37, Exh. 11 (GDFR); ¶¶ 38-40, Exh. 12 (Girls Like

You); ¶¶ 41-43, Exh. 13 (Hot N Cold); ¶¶ 44-46, Exh. 14 (I Cry); ¶¶ 47-49, Exh. 15 (I Love It); ¶¶ 50-52, Exh. 16 (I'm A Boss); ¶¶ 53-55, Exh. 17 (It's Gonna Be Me); ¶¶ 56-58, Exh. 18 (Lean On); ¶¶ 59-61, Exh. 19 (My First Kiss); ¶¶ 62-64, Exh. 20 (No Idea); ¶¶ 65-67, Exh. 21 (See You Again); ¶¶ 68-70, Exh. 22 (Shawty Got Moves); ¶¶ 71-73, Exh. 23 (Tik Tok); ¶¶ 74-76, Exh. 24 (Time of Our Lives); ¶¶ 77-79, Exh. 25 (Type of Way); ¶¶ 80-82, Exh. 26 (Want To Want Me); ¶¶ 83-85, Exh. 27 (We Own It).]

RESPONSE:  **Admitted**

16.    Kobalt Music Publishing America, Inc. ("Kobalt") has entered into exclusive administration agreements with each of the other Plaintiffs or through intercompany agreements with affiliates who have entered into exclusive administration agreements with the other Plaintiffs to obtain exclusive rights and administer rights in the Subject Works. [Trumbull Decl., ¶4; Arnay Decl., ¶¶ 3-21, Exh. 1-16; APG Decl., ¶¶ 51-52, Exh. 21; FNG Decl., ¶¶ 11-12, Exh. 4; Notting Hill Decl., ¶ 12, Exh. 9; MXM Decl., ¶¶ 11-12, Exh. 2; Kasz Money Decl., ¶4, Exh. 1; Prescription Decl., ¶ 10, Exh. 9.]

RESPONSE: **The Magic admits that Kobalt has entered into administration agreements but denies that the rights are exclusive because Plaintiffs have failed to submit competent summary judgment evidence demonstrating the percentage of ownership of each copyright holder.**

17.    Defendant owns and operates several social media accounts and a team website through nba.com. [Trechsel Decl., ¶7, Exh. 3, Defendant's Response to Interrogatory ("Int."). no. 5.].

RESPONSE:   **The Magic denies this statement because, as shown in the interrogatory response cited above, the Magic stated that it administers certain social media accounts, not**

**including the team website through nba.com. The Magic did not state in the interrogatory response that it owns and operates the social media accounts and the team website through nba.com.**

18.    Defendant states that it administers the following social media accounts in response to Plaintiffs' interrogatories: (1) https://www.facebook.com/OrlandoMagic; (2) https://www.instagram.com/orlandomagic/; (3) https://x.com/OrlandoMagic; (4) http://www.youtube.com/@OrlandoMagic; (5) TikTok: https://www.tiktok.com/@orlandomagic; (6) Snapchat: https://www.snapchat.com/add/magicnba. [Trechsel Decl., ¶ 7, Exh. 3, Defendant's Response to Int. no. 5.]

RESPONSE:    **Admitted**

19.    Defendant also states that it administers a page on the nba.com website directed to its content relating to news, promotional videos, highlights, links to purchase merchandise using Defendant's brand, and tickets. [Trechsel Decl., ¶ 7, Exh. 3, Defendant's Response to Int. no. 5.]

RESPONSE:    **The Magic denies this statement because it mischaracterizes the evidence. The interrogatory response cited by Plaintiffs does not state that the Magic administers the page on nba.com.**

20.    Defendant posts audio-visual content on these accounts and its website for promotional purposes and fan engagement, including Infringing Uses. [Trechsel Decl., ¶¶ 2, 3(u), Exh. 1, at 231:19-233:2.]

RESPONSE:    **The Magic denies this statement because it mischaracterizes the cited testimony, which says nothing about "Infringing Uses." The Magic admits that it posts audio-visual content on its social media accounts and team website for various purposes.**

21.     When creating its audio-visual content, including the Infringing Uses, Defendant recklessly used music without regard for its ownership or needing a synchronization license for its posted content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE:    **The Magic denies this statement because it is a legal conclusion and not a statement of fact.**

22.     Defendant did not have a policy related to clearing copyrighted works for its content. [Trechsel Decl., ¶¶ 2, 3(r), (t), Exh. 1, at 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (d), Exh. 2, at 11:21-12:5; 21:5-10.]

RESPONSE:    **The Magic denies this statement as worded because it is not temporally limited and the word "policy" is vague and ambiguous.**

23.     Defendant knew licenses were required to use third-party copyrighted materials. [Trechsel Decl., ¶¶ 2, 3(j), (k), Exh. 1, at 49:11-24, 50:7-17; 71:23-72:2.]

RESPONSE:    **Admitted**

24.     Defendant had a library of licensed music through a third-party service. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1.]

RESPONSE:    **Admitted**

25.     Defendant did not make copyright clearance inquiries before posting its content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE:    **The Magic denies this statement as worded because it is not temporally limited or limited to the alleged Accused Uses here.**

26.     [Intentionally Omitted]

RESPONSE:    **No response required.**

27.    On or around May 8, 2020, Kobalt engaged TuneSat, LLC ("TuneSat") to detect its and the other Plaintiffs' musical compositions in broadcasts of commercial content. [Declaration of Christopher Woods ("TuneSat Decl."), ¶ 3.]

RESPONSE:    **The Magic admits this statement in part but denies this statement to the extent it purports to encompass TuneSat's full scope of engagement. *See* Ex. A**

28.    TuneSat is an independent audio monitoring service. [TuneSat Decl., ¶ 2.]

RESPONSE:    **The Magic admits that TuneSat is an audio monitoring service but denies that it is "independent" because it works in conjunction with** ▮▮▮▮▮▮▮▮ **and** ▮▮▮▮▮▮ **and at the direction of Kobalt for purposes of the Subject Uses. *See* Doc. 65 ¶¶ 6, 7, 9, 12; Ex. A, TuneSat-Kobalt Agreement; Ex. B, Woods Dep. Tr. at 20:14-21:7, 28:20-29:12, 38:22-39:8, 102:7-15, 103:16-18, 143:21-23, 171:7-8, 172:1-4, 185:10-24, 219:11-220:2.**

29.    TuneSat's unique audio recognition technology monitors television and online content, helping rightsholders identify and collect the uses of their music. [TuneSat Decl., ¶¶ 2, 4.]

RESPONSE:    **Admitted**

30.    TuneSat's technology creates "acoustic fingerprints" from client music recordings. [TuneSat Decl., ¶¶ 4-5.]

RESPONSE:    **Admitted**

31.    It then runs those "acoustic fingerprints" against archived content stored by TuneSat. [TuneSat Decl., ¶ 4.]

RESPONSE:    **Admitted.**

32.    TuneSat engages in quality control to validate detections of its clients' music. [TuneSat Decl., ¶ 8.]

RESPONSE:   **Admitted**

33.    TuneSat's technology cannot find a detection if it does not have an "acoustic fingerprint" of a client's work. [TuneSat Decl., ¶ 7.]

RESPONSE:   **The Magic denies this statement because TuneSat can detect uses of a song without an acoustic fingerprint from a specific client. Doc. 65 ¶ 13; *see also* Ex. C, TuneSat detection results.**

34.    TuneSat likewise cannot find a detection if TuneSat has not located and archived a particular channel of videos by a potential infringer. [TuneSat Decl., ¶ 7.]

RESPONSE:   **The Magic admits that TuneSat cannot detect an audio fingerprint in a potentially infringing use by a particular potential infringer if TuneSat has not located and archived a channel containing potentially infringing uses.**

35.    On or around July 13, 2020, Kobalt retained the Kuhn Law Group ("Kuhn") to advise and confirm whether TuneSat's detections amounted to infringement and to pursue those claims once confirmed. [Declaration of Jessie Kuhn ("Kuhn Decl."), ¶¶ 2-3; Declaration of Erica Carvajal Wong ("Wong Decl."), ¶ 3.]

RESPONSE:   **Admitted. See Ex. D, KLG-Kobalt Agreement**

36.    TuneSat would provide Kuhn detections of the Plaintiffs' works. [Kuhn Decl., ¶ 3; Wong Decl., ¶ 3.]

RESPONSE:   **The Magic denies this statement as worded because TuneSat provides Kuhn with access to a part of TuneSat's CSM database that allows Kuhn to view the detections, not that TuneSat provides the detections. *See* ¶ 40; Doc. 65 ¶¶ 9, 12; Ex. C, Woods Dep. Tr. at 139:1-22.**

37.     Then Kuhn would analyze whether licenses existed or whether there were other reasonable defenses to infringement for each detection and, if not, Kuhn would seek recovery for the infringing activity. [Kuhn Decl., ¶ 3; Wong Decl., ¶ 3.]

RESPONSE:   **The Magic admits that Kuhn has sought recovery for alleged infringing activity but lacks information sufficient to admit or deny any statements regarding Kuhn's analysis.**

38.     In 2021, TuneSat started to provide Kuhn with detections of Plaintiffs' works in Defendant's content posted to their website and social media accounts. [Kuhn Decl., ¶¶ 4-7, Exh. 1-2.]

RESPONSE:   **The Magic denies this statement because there is no competent summary judgment evidence supporting it.  The cited paragraphs of the Kuhn declaration do not state that TuneSat began providing Kuhn with detections in 2021.**

39.     Kuhn received these detections and, seeing no licenses, fair use, or other applicable copyright defense, began notifying Defendant of the potentially infringing uses. [Kuhn Decl., ¶¶ 4-7, Exh. 1-2.]

RESPONSE:   **The Magic admits that Kuhn notified it of potentially infringing uses but denies that there were no applicable copyright defenses.**

40.     Kuhn accessed these detections through TuneSat's case management system and, at that point, did their infringement review. [Kuhn Decl., ¶ 3; Wong Decl., ¶¶ 3-4.]

RESPONSE:   **The Magic lacks sufficient information to admit or deny this statement.**

41.     After an initial confirmation in 2021 with Kobalt that Defendant did not have licenses for any of Plaintiffs' works, Kobalt authorized Kuhn to enforce detections they confirmed to be infringing without further input. [Kuhn Decl., ¶ 3]

RESPONSE:  **The Magic lacks sufficient information to admit or deny this statement.**

42.    On March 8, 2021, an attorney at Kuhn sent the first letter to Defendant regarding Case 1:24-cv-05461-JSR Document 47 Filed 02/14/25 Page 8 of 12.]

RESPONSE:  **Admitted**

43.    The March 8, 2021 letter contained no detections at issue in this dispute. [Kuhn Decl., ¶¶ 3-7, Exh. 1-2; cf. FAC, Exh. 1.]

RESPONSE:  **Admitted**

44.    A Kuhn attorney sent another letter on July 19, 2021. [Wong Decl., ¶¶ 4-5, Exh. 3-4.]

RESPONSE:  **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

45.    The July 19, 2021 letter contained 42 detections of the Plaintiffs' music in the Defendant's content. [Wong Decl., ¶¶ 4-5, Exh. 3-4.]

RESPONSE:  **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

46.    Of those 42 detections, only 10 are at issue in this dispute. [Wong Decl., ¶ 6.]

RESPONSE:  **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

47.    For the 10 detections included in the July 19, 2021 Kuhn letter, Kuhn viewed those detections from TuneSat on July 19, 2021, and immediately sent out the letter on the same day. [Wong Decl., ¶¶ 4,7.]

RESPONSE:    **Defendant lacks information sufficient to confirm or deny when Kuhn first viewed those detections. Furthermore, Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

48.    Kuhn did not delay even one day between the new TuneSat detections becoming visible on their case management system and sending out the letter. [Wong Decl., ¶¶ 4, 7.]

RESPONSE:    **Defendant lacks sufficient information to confirm or deny when Kuhn first viewed those detections. Furthermore, Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

49.    On August 17, 2021, Kuhn sent another letter to Orlando, including a spreadsheet of detections, but removed one detection and did not include any additional detections. [Wong Decl., ¶ 8, Exh. 5-6.]

RESPONSE:    **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

50.    On December 2, 2021, Kuhn sent another letter to Orlando with an updated list of detections but no new detections. [Kuhn Decl., ¶ 8, Exh. 7-8.]

RESPONSE:    **Admitted**

51.    On June 17, 2022, Kuhn sent a new letter containing 33 new detections received since the December 2, 2021 letter. [Wong Decl., ¶ 9, Exh. 9-10.]

RESPONSE:    **Admitted**

52.    Kuhn sent a final letter on August 22, 2023, with an updated report removing four detections and adding one new detection. [Wong Decl., ¶ 10, Exh. 11-12.].

RESPONSE:    **Admitted**

53.    Despite receiving numerous letters notifying them of their infringement over several years, Defendant failed to resolve this issue before the need for litigation. [Kuhn Decl., ¶¶ 3-8, Exh. 1-2, 7-8; Wong Decl., ¶¶ 4-10, Exh. 3-4, 5-6, 9-12.]

RESPONSE:    **The Magic denies this statement because it is vague and ambiguous in that it purports to blame Defendant for "fail[ing] to resolve this issue before the need for litigation."**

54.    Indeed, Defendant continued to infringe, uploading one of the Infringing Uses in 2023 and another in 2024. [Trechsel Decl., ¶¶ 2, 4(b), (v), Exh. 1, at 130:15-132:5; 157:23-158:5; 215:25-216:10; 195:15-196:3; ¶¶ 5, 6(f), Exh. 2, at 91:7-15.]

RESPONSE:    **The Magic admits that it uploaded two of the videos alleged to be Infringing Uses in 2023 and 2024 respectively.**

55.    Of the 27 compositions, 16 peaked in the top 10 on the Billboard Hot 100 Chart, 24 have over 100 million total streams (including 5 with over 1 billion total streams), and 22 are certified Platinum or Diamond by the Recording Industry Association of America. [Trechsel Decl., ¶ 8, Exh. 4.]

RESPONSE:    **The Magic lack information sufficient to admit or deny this statement.**

56.    Each of the 27 compositions appear on all primary streaming services, including Apple, Spotify, and Amazon. [Trechsel Decl., ¶ 8, Exh. 4.]

RESPONSE:    **The Magic lack information sufficient to admit or deny this statement.**

57.    Defendant has failed to produce any evidence establishing that anyone other than Plaintiffs own the Subject Works. [Trechsel Decl., ¶ 9.]

RESPONSE:    **The Magic admits that it has not produced evidence in this action regarding the ownership of the Subject Works.**

58.    During the Defendant's 30(b)(6) deposition, the deponent repeatedly testified that he recognized the Subject Work and that it sounded substantially similar to the song in the Infringing Use. [Trechsel Decl., ¶¶ 4, Exh. 1 (Krohmer Deposition Transcript, Exh. 3-38 therein); ¶¶ 5, 6(a), Exh. 2, at 5:5-10.]

RESPONSE:    **Admitted**

59.    An ordinary observer hearing the Subject Work and the Infringing Use can hear the same song being played. [Trechsel Decl., ¶¶ 4, Exh. 1 (Krohmer Deposition Transcript, Exh. 3-38 therein).]

RESPONSE:    **The Magic lack sufficient information to admit or deny this statement.**

60.    Defendant testified it is a sophisticated corporation. [Trechsel Decl., ¶¶ 2, 3(s), Exh. 1, at 228:9-13.]

RESPONSE:    **The Magic admit that its corporate representative agreed that the Orlando Magic NBA team is a "sophisticated company in the area it does business in." The Magic denies this statement to the extent it is a legal conclusion and not a statement of fact.**

61.    Defendant testified that they did not have a policy in place regarding the use of third-party copyrights at the time the majority of the Infringing Uses were made, and even to this

day continue to not have an official policy but simply a general understanding to be "mindful" of potential infringement. [Trechsel Decl., ¶¶ 2, 3(r), (t), Exh. 1, at 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (c), (d), Exh. 2, at 11:21-12:5; 16:16-17:19; 21:5-10.]

RESPONSE:   **The Magic denies this statement to the extent it is taken out of context because the witness testified that questions related to licensing are directed to the Magic's general counsel. Ex. F, Feb. 11, 2025 Krohmer Dep. R. Tr. ("Krohmer Dep. Vol. 2") at 24:1–16; 25:1–14.**

62.    Defendant testified that they did not investigate who owned the music they were going to use prior to posting the content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE:   **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record. The Magic admits that it did not investigate the ownership of each of the Subject Works.**

63.    Defendant testified that they did not investigate if they had a license or the right to use the content in online or social media posts. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE:   **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record. The Magic admits that it did not investigate the ownership of each of the Subject Works.**

64.    Finally, Defendant testified that no one in its social media department was taught or trained on the proper way to obtain a license for music to use in social media posts. [Trechsel Decl., ¶¶ 2, 3(q), (r), (t), Exh. 1, at 148:3-9; 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (c), (d), Exh. 2, at 11:21-12:5; 16:16-17:19; 21:5-10.]

RESPONSE:  **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record.**

65.    The Orlando deponent indicated that Orlando had two sources from which to draw properly licensed music: 1) Orlando's own library of production music, Killer Tracks; or 2) the NBA's library of production music, United Masters. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1.]

RESPONSE:  **The Magic denies this statement because it is not temporally limited, it mischaracterizes the cited testimony and is not supported by cites to the record.**

66.    By sourcing music outside of these libraries, in which Orlando could search and pull music directly, Orlando clearly knew that they were using unlicensed music and knew that a license was required. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), (j), (k), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1; 49:11-24, 50:7-17; 71:23-72:2.]

RESPONSE:  **The Magic denies this statement because it is a legal conclusion, not a statement of fact, it mischaracterizes the testimony, and it is not supported by cites to the record. Indeed, the Magic believed that the use of the Subject Works in the Accused Uses was covered by the in-arena performance license or other through other means. Ex. F, Krohmer Dep. Vol. 2 at 23:15–19, 71:16-22, 72:8–11, 95:22-96:1, 96:3-5; Ex. G, Declaration of Lorenzo Guererro ("Guererro Decl.") ¶¶ 4-5; Ex. H, Declaration of Jeanine Klem-Thomas ("Klem-Thomas Decl.") ¶¶ 3-5.**

67.    Orlando did not try to investigate whether they correctly licensed the music in the Infringing Uses. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE:  **The Magic admits that they did not perform investigations with respect to each Subject Work.**

68.    Defendant has been the subject of copyright litigation for the infringing use of music in the past. [Trechsel Decl., ¶¶ 2, 3(l), Exh. 1, at 97:18-98.4.]

RESPONSE:  **This statement mischaracterizes the cited testimony and does not rely on any admissible testimony. During his deposition, the Magic's corporate representative testified that he did not "know of any specifics" related to copyright infringement suits against the Magic. Ex. E, Jan. 23, 2025 Deposition Transcript of Geoff Krohmer ("Krohmer Dep. Vol. 1") at 99:21–24.**

69.    Defendant estimates its Twitter page averages 1,500 posts per month, going back to 2009. [Trechsel Decl., ¶¶ 5, 6(e), Exh. 2, at 82:23-83:11.]

RESPONSE:  **The Magic denies this statement to the extent it is unsupported by any admissible evidence but otherwise admits this statement.**

70.    Defendant has, at minimum, eight active copyrights registered with the U.S. Copyright Office. [Trechsel Decl., ¶ 10, Exh. 41.]

RESPONSE:  **Admitted**

71.    Defendant has, at minimum, thirty three active trademarks registered with the U.S. Trademark Office. [Trechsel Decl., ¶ 11, Exh. 42.]

RESPONSE:  **Admitted**

**DEFENDANT'S ADDITIONAL STATEMENTS OF FACT IN RESPONSE**

72.    The Accused Uses in Exhibit 1 of the Complaint date back well over ten years ago. Ex. E, Krohmer Dep. Vol. 1 at 42:12–19. Only two of the Accused Uses were uploaded after 2020, with one uploaded in 2023 and one uploaded in 2024. *See* Plaintiffs' Motion at 12 & ¶ 54 above; Ex. G, Guererro Decl. ¶ 3; Ex. H, Klem-Thomas Decl. ¶ 3.

73.     Accused Uses Nos. 3, 4, and 19 in Exhibit 1 of the Complaint were created and posted in Brazil, by a marketing company, SAMBA Services ("SAMBA"), with whom the Magic contract. Ex. I, Declaration of Geoff Alan Krohmer ("Krohmer Decl.") ¶¶ 3, 6. As part of their engagement, SAMBA's team in Brazil makes content that is posted on the Brazilian social media accounts. *Id*. ¶ 4. All content decisions are made by SAMBA and the content is physically posted by SAMBA's team located in Brazil. *Id*. ¶ 5.

74.     The Accused Uses were not posted as advertisements. *See* Ex. E, Krohmer Dep. Vol. 1 at 232:10–19. Nor is there any evidence that the Magic monetized the Accused Uses. *Id*. at 78:2–3. And while the Accused Uses contain music, the Magic understand that "there is a significant amount of social media users [] that view . . . their social media without sound on." *Id*. at 169:21–23.

75.     Although the Magic had a library of production music (through Killer Tracks), that library was for "broadcast and radio use," and "at that time, video was barely even posted on the internet." Ex. F, Krohmer Dep. Vol. 2 at 40:22-41:7. It was not until 2018 or 2019 that social media was even included in the Killer Tracks agreement, and it was only included for paid "advertising purposes," which would not include the Accused Uses. *Id*. at 41:9-21.

76.     During the time that all but two of the Accused Uses were posted, the Magic's understanding was that the "performance license would have covered any of the use[s]" of the Subject Works in the Accused Uses. Ex. F, Krohmer Dep. Vol. 2 at 95:22-96:1. Magic employees believed that "something that was captured in arena during one of [their] games," was "covered under [the team's] performance license in arena." *Id*. at 23:15–19. At that time, they believed that the Magic's "license with the NBA and performance license," gave them clearance to use the music in the Subject Works. *See Id*. at 71:16-22. The general understanding of Magic employees

was that they had a "blanket license for in arena use" of songs. *Id*. at 72:8–11. The Magic's corporate representative testified that the Magic are not aware of anyone who posted a video that thought he or she was not permitted to do so. *Id*. at 96:3-5.

77.    According to the Magic corporate representative, there "is a different understanding now than there [] was in the past" with respect to what music a user could post to social media. *Id*. at 48:4-15. Magic employees posted Accused Works on "platforms [that] did allow and enable users to use certain music in their content," whereas now, "the platforms . . . will prevent [] specific uses of music that they previously did not." *Id*. at 48:10–25.

78.    For example, the Magic understood that TikTok "allowed all accounts including commercial to use any music on their platform," because users had the "ability to [] insert the music within the app. It was the understanding that [] TikTok likely had the license that would allow accounts to do [that]." *Id*. at 50:10–18. This is what happened when a Magic employee posted an Accused Use in 2024. Ex. H, Klem-Thomas Decl. ¶¶ 3, 4. The employee "uploaded a picture to the Instagram Application, where [she] was given the option . . . to insert the music in the video." *Id*. ¶ 5. The employee "believed this music was cleared for the [] Magic's use by Instagram because there was no warning regarding this feature not being usable by the [] Magic or needing to obtain any additional license to use this music in this Instagram Story." *Id*.

79.    In 2023, a Magic employee posted an Accused Use after he "searched in the YouTube Application for royalty-free music and found the instrumental track that [he] inserted into the video, which [he] believed was cleared for the [] Magic's use." Ex. G, Guererro Decl. ¶ 4. At the time, he "did not believe this track was the Meek Mill song 'I'm a Boss'" rather, he "thought it was a similar sounding instrumental track that was pre-cleared by YouTube for use by all YouTube users. *Id*. ¶ 5.

80.     After discovery in this action closed, Plaintiffs belatedly produced hand-picked examples of social media licenses between Kobalt on the one hand, and Facebook, Meta, Google, and TikTok on the other. Ex. J, Kobalt-Facebook Agreement (KOBALT_ORLANDO001487-KOBALT_ORLANDO_001510); Ex. K, Kobalt-Meta Agreement (KOBALT_ORLANDO001511-KOBALT_ORLANDO_001532); Ex. L, Kobalt-TikTok Agreement (KOBALT_ORLANDO001533-KOBALT_ORLANDO_001545); Ex. M, Kobalt-Google Agreement (KOBALT_ORLANDO001546-KOBALT_ORLANDO_001585) *see also* Supplemental Declaration of Benjamin T. Pendroff ¶ 3. These licenses contain language indicating that the Accused Uses ██████████████████████ and therefore did not infringe. *See, e.g.*, Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001546, Sec. 1.1; Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001552–53, Secs. 2.1, 2.3.

81.     Kobalt's agreement with Google (which covers YouTube) contains an ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001554, Sec. 2.6.

82.     However, Plaintiffs did not produce social media agreements covering all of the years of the relevant Accused Uses. Supplemental Declaration of Benjamin T. Pendroff ¶ 3.

Date:   New York, New York
        February 28, 2025

                                        Respectfully submitted,

                                        **BARNES & THORNBURG LLP**

                                        By: */s/ Benjamin T. Pendroff*
                                        Benjamin T. Pendroff
                                        New York Bar No. 5013982
                                        Anna Kalinina *(admitted pro hac vice)*
                                        Texas Bar No. 24092605
                                        2121 N. Pearl Street, Suite 700
                                        Dallas, TX 75201-2469
                                        Telephone: (214) 258-4200
                                        Facsimile: (214) 258-4199
                                        Email: bpendroff@btlaw.com
                                        Email: Anna.Kalinina@btlaw.com

                                        David S. Slovick
                                        New York Bar No. 5337811
                                        390 Madison Avenue, 12th Floor
                                        New York, New York 10017
                                        Telephone:  (646) 746-2000
                                        Facsimile:  (646) 746-2001
                                        Email: David.Slovick@btlaw.com

                                        William Craver (*admitted pro hac vice*)
                                        2029 Century Park East, Suite 300
                                        Los Angeles, CA 90067
                                        Telephone: (310) 284-3771
                                        Facsimile: (310) 284-3894
                                        Email: wcraver@btlaw.com

                                        ***Counsel for Defendant Orlando Magic, Ltd.***

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this pleading was served on all counsel of record on February 28, 2025 through the Court's electronic filing system.

                                        */s/ Benjamin T. Pendroff*
                                        Benjamin T. Pendroff