## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No: 1:24-cv-546-JSR

| | |
|---|---|
| **ARTIST PUBLISHING GROUP, LLC dba APG, a Delaware Limited Liability Company; FIRST-N-GOLD PUBLISHING, INC., a Florida Corporation; LUKASZ GOTTWALD an individual doing business as KASZ MONEY PUBLISHING; KMA ASSETS I LP, a Delaware Limited Partnership; KMA ASSETS II LIMITED, a United Kingdom Private Limited Company; KOBALT MUSIC PUBLISHING AMERICA, INC. dba KMPA, a Delaware Corporation; MXM MUSIC AB dba MXM, a Swedish Limited Liability Company; NOTTING HILL MUSIC, INC., a New York Corporation; and PRESCRIPTION SONGS, LLC, a California Limited Liability Company,** | **PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS** |
| **Plaintiffs,** | |
| **vs.** | |
| **ORLANDO MAGIC, LTD. dba ORLANDO MAGIC, a Florida Limited Partnership; and DOES 1-10, inclusive,** | |
| **Defendants.** | |

1

## PLAINTIFFS' RESPONSE TO DEFENDANT'S SATEMENT
## OF ADDITIONAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Plaintiffs Artist Publishing Group, LLC, First-N-Gold Publishing, Inc., Lukasz Gottwald dba Kazs Money Publishing, KMA Assets I LP, KMA Assets II Limited, Kobalt Music Publishing America, Inc. dba KMPA, MXM Music AB dba MXM, Notting Hill Music, Inc., and Prescription Songs, LLC (collectively "Plaintiffs") respectfully submit this response to Defendant Orlando Magic, Ltd. dba Orlando Magic's ("Orlando" or "Defendant") Response to Plaintiffs' Statement of Facts and Defendant's Additional Statement of Facts (Dkt. 77).[1]

### Plaintiffs' Statement of Material Facts (nos. 1-71) and Defendant's Responses Thereto

1.      Plaintiffs are music publishers and administrators who control an extensive catalog of musical compositions. [Declaration of Brett Copell ("APG Decl."), *see generally* UU 250; Declaration of Ted Lucas ("FNG Decl."), *see generally* UU 4-12; Declaration of Andy McQueen ("Notting Hill Decl."), *see generally* UU 3-12; Declaration of Tomas Ljung ("MXM Decl."), *see generally* UU 3-10; Declaration of Lukasz Gottwald ("Kasz Money Decl."), *see generally* UU 3-4; Declaration of Diana Sanders ("Prescription Decl."), *see generally* UU 3-10; Declaration of James Arnay ("Arnay Decl."), UU 3-4; Declaration of Jon Trumbull ("Trumbull Decl."), UU 3-4.]

RESPONSE: **Admitted**

---

[1] References to "SOMF" shall refer collectively to Plaintiffs' Statement of Material Facts (nos. 1-71) and Defendant's Additional Statement of Facts in Response (nos. 72-82), all of which are set forth herein. References to "Def. SOMF" are to Defendant's Statement of Material Facts in Support of its Motion for Partial Summary Judgment, dated February 14, 2025 (Dkt. 65). Finally, Plaintiffs refer to the Supplemental Declaration of Frank Trechsel and the exhibits attached thereto, filed in support of the current statement to address additional facts raised by Defendant in its Opposition, as "Supp. Trechsel Decl."

2.      Of that catalog, 27 distinct compositions (the "Subject Works") are at issue in this dispute and cataloged in exhibit 1 to the First Amended Complaint (Dkt. 40). [*See* First Amended Complaint, ECF No. 40 ("FAC"), ¶ 1, Exh. 1.]

RESPONSE: **The Magic admits that 27 distinct compositions are it issue in this dispute but denies that Plaintiffs have sufficiently proven their ownership interests in those songs. Plaintiffs do not offer competent summary judgment evidence of their percentage ownership of the songs and much of the evidence on which Plaintiffs rely is inadmissible, including the defective declarations of Brett Copell/Caitlyn Miles (Docs. 48, 64), Diana Sanders (Docs. 54, 68), and James Arnay (Docs 50, 66).**

3.      Defendant owns and operates the National Basketball Association team, the Orlando Magic. [*See* Defendant's Answer to Complaint (Dkt. 21), ¶ 19.]

RESPONSE: **Admitted**

4.      [Intentionally Omitted]

RESPONSE: **No response required.**

5.      [Intentionally Omitted]

RESPONSE: **No response required.**

6.      Plaintiffs own the copyrights in the Subject Works. [APG Decl., ¶¶ 3-5, Exh. 1 (Boyfriend); ¶¶ 6-10, Exh. 2-3 (Fantasy); ¶¶ 11-13, Exh. 4 (Fireball); ¶¶ 14-22, Exh. 5-9 (GDFR); ¶¶ 23-30, Exh. 10-14 (I Cry); ¶¶ 31-33, Exh. 15 (No Idea); ¶¶ 34-37, Exh. 16 (See You Again); ¶¶ 38-40, Exh. 17 (Shawty Got Moves); ¶¶ 41-43, Exh. 18 (Type of Way); ¶¶ 44-46, Exh. 19 (Want to Want Me); ¶¶ 47-50, Exh. 20 (We Own It); FNG Decl., ¶¶ 3-5, Exh. 1-2 (All I Do Is Win); ¶¶ 6-8, Exh. 3 (All the Way Up); ¶¶ 9-10, Exh. 1-2 (I'm A Boss); Notting Hill Decl., ¶¶ 3-5, Exh. 1 ((I Know I Got) Skillz); ¶¶ 6-8, Exh. 2-5 (A Little Party Never Killed Nobody (All

We Got)); ¶¶ 9-11, Exh. 6-8 (All I Do Is Win); MXM Decl., ¶¶ 3-6, Exh. 1 (…Baby One More Time); ¶¶ 7-8, Exh. 1 (Hot N Cold); ¶¶ 10-11, Exh. 1 (It's Gonna Be Me); Kasz Money Decl., ¶¶ 1, 3; Prescription Decl., ¶ 3, Exh. 1 (Boys); ¶ 4, Exh. 2 (Don't Start Now); ¶ 5, Exh. 3 (Lean On); ¶¶ 6-7, Exh. 4-5 (Tik Tok); ¶7, Exh. 5 (My First Kiss); ¶8, Exh. 6-7 (Girls Like You) and (Time of Our Lives); ¶9, Exh. 8 (Hot N Cold); Arnay Decl., ¶¶ 10, 15, Exh. 5, 10.]

RESPONSE: **The Magic admits that some Plaintiffs have some ownership interest in the Subject Works but denies this statement to the extent that Plaintiffs have not included competent summary judgment proof of their percentage of ownership in the Subject Works. The Magic further denies this statement with respect to Plaintiffs APG, Prescription, KMA Assets I LP, and KMA Assets II Limited because, as described below, they have not submitted competent summary judgment evidence of their ownership of the Subject Works.**

7.    Artist Publishing Group, LLC entered into exclusive co-publishing agreements with songwriters Mason David Levy, Kevin Clark White, Michael Clinton Woods, Andrew Nabeel Bazzi, Andreas Schuller, Justin Scott Franks, Michael Caren, Andrew Martin Cedar, Paulo Ytienza Rodrigues, Raphael Jurdin, Alex Schwartz, Joseph Khajadourian, Pierre-Antoine Joseph Michel Melki, Caleb Zackery Toliver, Charlie Otto Puth, Willie C. Poole, Lionel Cart, Samuel Denison Martin, Breyan Stanley Isaacs, for their respective rights in the Subject Works, "Boyfriend," "Fireball," "GDFR," "I Cry," "No Idea," "See You Again," "Shawty Got Moves," "Type of Way," "Want To Want Me," "We Own It," and "Fantasy." [APG Decl., ¶¶ 3-5, Exh. 1 (Boyfriend); ¶¶ 6-10, Exh. 2-3 (Fantasy); ¶¶ 11-13, Exh. 4 (Fireball); ¶¶ 14-22, Exh. 5-9 (GDFR); ¶¶ 23-30, Exh. 10-14 (I Cry); ¶¶ 31-33, Exh. 15 (No Idea); ¶¶ 34-37, Exh. 16 (See You

Again); ¶¶ 38-40, Exh. 17 (Shawty Got Moves); ¶¶ 41-43, Exh. 18 (Type of Way); ¶¶ 44-46, Exh. 19 (Want to Want Me); ¶¶ 47-50, Exh. 20 (We Own It).]

<u>RESPONSE:</u> **The Magic denies APG's ownership in the Subject Works listed above because APG has failed to submit competent summary judgment evidence of such ownership. APG submitted a declaration purporting to prove APG's ownership of the Subject Works (Docs. 48 and 64), however, the declarations submitted on behalf of APG are defective because the named Declarant is Brett Copell but the declarations were signed by Caitlyn Miles. Accordingly, there is no admissible evidence in Plaintiffs' Motion proving APG's ownership in the above Subject Works. The Magic further denies this statement because Plaintiffs lack competent summary judgment evidence of APG's percentage ownership of the Subject Works.**

8.    First-n-Gold Publishing Inc. entered into agreements with songwriters William Roberts and Shandel Green for exclusive rights and ownership in the works "All The Way Up," "I'm A Boss," and "All I Do Is Win." [FNG Decl., ¶¶ 3-5, Exh. 1-2 (All I Do Is Win); ¶¶ 6-8, Exh. 3 (All the Way Up); ¶¶ 9-10, Exh. 1-2 (I'm A Boss).]

<u>RESPONSE:</u> **The Magic admits that First-n-Gold Inc. entered into agreements with William Roberts and Shandel Green related to the above Subject Works but denies that the agreements gave First-n-Gold Publishing Inc. exclusive rights and ownership in the works because Plaintiffs did not submit competent summary judgment evidence that First-n-Gold had complete and exclusive ownership in the Subject Works.**

9.    Notting Hill Music, Inc. entered into agreements with songwriters Cecil Demetrius Womack, Francesca Maeondra Richard, and Khaled Mohammed Khaled for exclusive rights in the works "A Little Party Never Killed Nobody (All We Got)," "(I Know I Got) Skillz,"

and "All I Do Is Win." [Notting Hill Decl., ¶¶ 3-5, Exh. 1 ((I Know I Got) Skillz); ¶¶ 6-8, Exh. 2-5 (A Little Party Never Killed Nobody (All We Got)); ¶¶ 9-11, Exh. 6-8 (All I Do Is Win).]

RESPONSE: **The Magic admits that Notting Hill Music, Inc. entered into agreements with Cecil Demetrius Womack, Francesca Maeondra Richard, and Khaled Mohammed Khaled related to the above Subject Works but denies that the agreements gave Notting Hill Music, Inc. exclusive rights in the works because Plaintiffs did not submit competent summary judgment evidence proving that Notting Hill Music, Inc. had complete and exclusive ownership in the Subject Works.**

10.    MXM Music AB entered into an agreement with songwriter Max Martin for exclusive rights to "…Baby One More Time," "It's Gonna Be Me," and "Hot n Cold." [MXM Decl., ¶¶ 3-6, Exh. 1 (…Baby One More Time); ¶¶ 7-8, Exh. 1 (Hot N Cold); ¶¶ 10-11, Exh. 1 (It's Gonna Be Me).]

RESPONSE: **The Magic admits that MXM Music AB entered into an agreement with Max Martin related to the above Subject Works but denies that the agreements gave MXM Music AB exclusive rights in the works because Plaintiffs did not submit competent summary judgment evidence proving that MXM Music AB had complete and exclusive ownership in the Subject Works.**

11.    Lukas Gottwald, doing business as Kasz Money Publishing, is the co-writer and owner of the copyrights as an author for the works "My First Kiss," "Tik Tok," "Time of Our Lives," and "Hot n Cold." [Kasz Money Decl., ¶¶ 1, 3.]

RESPONSE: **Admitted**

12.    Prescription Songs, LLC entered into agreements with songwriters Aaron Jennings Puckett, Emily Schwartz, Katy Perry, Philip Meckspecker, Benjamin Joseph Levin, and

Kesha Sebert for exclusive rights in "Boys," "Don't Start Now," "Girls Like You," "Lean On"

"My First Kiss," "Tik Tok," "Time of Our Lives," and "Hot n Cold." [Prescription Decl., ¶ 3,

Exh. 1 (Boys); ¶ 4, Exh. 2 (Don't Start Now); ¶ 5, Exh. 3 (Lean On); ¶¶ 6-7, Exh. 4-5 (Tik Tok);

¶7, Exh. 5 (My First Kiss); ¶8, Exh. 6-7 (Girls Like You) and (Time of Our Lives); ¶9, Exh. 8

(Hot N Cold).]

RESPONSE: **The Magic admits that Prescription Songs, LLC entered into**

**agreements with Aaron Jennings Puckett, Emily Schwartz, Katy Perry, Philip**

**Meckspecker, Benjamin Joseph Levin, and Kesha Sebert related to the above Subject**

**Works but denies that the agreements gave Prescription Songs, LLC exclusive rights in the**

**Subject Works because Plaintiffs did not submit competent summary judgment evidence**

**proving that Prescription Songs, LLC had complete and exclusive ownership in the Subject**

**Works. Furthermore, the Declaration of Diana Sanders (Docs. 54, 68) purporting to**

**attribute the above Subject Works to the above-named authors contains statements on**

**"information and belief" but not on the declarant's personal knowledge, rendering her**

**declaration defective.**

13.     KMA Assets I LP obtained rights through a purchase agreement in the works "A

Little Party Never Killed Nobody (All We Got)." [Arnay Decl., ¶ 15, Exh. 10.]

RESPONSE: **The Magic denies this statement because Paragraph 15 of the Arnay**

**declaration (Docs. 50, 66) states that KMSA, not KMA Assets I LP entered into an asset**

**purchase agreement and KMA Assets I LP is not a party to the Asset Purchase Agreement**

**at Exhibit 10 (Doc. 66-10), therefore there is no competent summary judgment evidence**

**proving this statement.**

14.     KMA Assets II Limited obtained rights through a purchase agreement in "I Love It (feat. Charli XCX)." [Arnay Decl., ¶ 10, Exh. 5.]

RESPONSE: **The Magic denies this statement because Paragraph 10 of the Arnay declaration (Docs. 50, 66) states that KMSL, not KMA Assets II Limited, entered into an asset purchase agreement and KMA Assets II Limited is not a party to the Asset Purchase Agreement at Exhibit 5 (Doc. 66-5), therefore there is no competent summary judgment evidence proving this statement.**

15.     The Subject Works are registered with the United States Copyright Office. [Declaration of Jon Trumbull ("Trumbull Decl."), ¶¶ 5-7, Exh. 1 ((I Know I Got) Skillz); ¶¶ 8-10, Exh. 2 (…Baby One More Time); ¶¶ 11-13, Exh. 3 (A Little Party Never Killed Nobody (All We Got)); ¶¶ 14-16, Exh. 4 (All I Do Is Win); ¶¶ 17-19, Exh. 5 (All the Way Up); ¶¶ 20-22, Exh. 6 (Boyfriend); ¶¶ 23-25, Exh. 7 (Boys); ¶¶ 26-28, Exh. 8 (Don't Start Now); ¶¶ 29-31, Exh. 9 (Fantasy); ¶¶ 32-34, Exh. 10 (Fireball); ¶¶ 35-37, Exh. 11 (GDFR); ¶¶ 38-40, Exh. 12 (Girls Like You); ¶¶ 41-43, Exh. 13 (Hot N Cold); ¶¶ 44-46, Exh. 14 (I Cry); ¶¶ 47-49, Exh. 15 (I Love It); ¶¶ 50-52, Exh. 16 (I'm A Boss); ¶¶ 53-55, Exh. 17 (It's Gonna Be Me); ¶¶ 56-58, Exh. 18 (Lean On); ¶¶ 59-61, Exh. 19 (My First Kiss); ¶¶ 62-64, Exh. 20 (No Idea); ¶¶ 65-67, Exh. 21 (See You Again); ¶¶ 68-70, Exh. 22 (Shawty Got Moves); ¶¶ 71-73, Exh. 23 (Tik Tok); ¶¶ 74-76, Exh. 24 (Time of Our Lives); ¶¶ 77-79, Exh. 25 (Type of Way); ¶¶ 80-82, Exh. 26 (Want To Want Me); ¶¶ 83-85, Exh. 27 (We Own It).]

RESPONSE: **Admitted**

16.     Kobalt Music Publishing America, Inc. ("Kobalt") has entered into exclusive administration agreements with each of the other Plaintiffs or through intercompany agreements with affiliates who have entered into exclusive administration agreements with the other

Plaintiffs to obtain exclusive rights and administer rights in the Subject Works. [Trumbull Decl., ¶4; Arnay Decl., ¶¶ 3-21, Exh. 1-16; APG Decl., ¶¶ 51-52, Exh. 21; FNG Decl., ¶¶ 11-12, Exh. 4; Notting Hill Decl., ¶ 12, Exh. 9; MXM Decl., ¶¶ 11-12, Exh. 2; Kasz Money Decl., ¶4, Exh. 1; Prescription Decl., ¶ 10, Exh. 9.]

RESPONSE: **The Magic admits that Kobalt has entered into administration agreements but denies that the rights are exclusive because Plaintiffs have failed to submit competent summary judgment evidence demonstrating the percentage of ownership of each copyright holder.**

17.    Defendant owns and operates several social media accounts and a team website through nba.com. [Trechsel Decl., ¶7, Exh. 3, Defendant's Response to Interrogatory ("Int."). no. 5.].

RESPONSE: **The Magic denies this statement because, as shown in the interrogatory response cited above, the Magic stated that it administers certain social media accounts, not including the team website through nba.com. The Magic did not state in the interrogatory response that it owns and operates the social media accounts and the team website through nba.com.**

18.    Defendant states that it administers the following social media accounts in response to Plaintiffs' interrogatories: (1) https://www.facebook.com/OrlandoMagic; (2) https://www.instagram.com/orlandomagic/; (3) https://x.com/OrlandoMagic; (4) http://www.youtube.com/@OrlandoMagic; (5) TikTok: https://www.tiktok.com/@orlandomagic; (6) Snapchat: https://www.snapchat.com/add/magicnba. [Trechsel Decl., ¶ 7, Exh. 3, Defendant's Response to Int. no. 5.]

RESPONSE: **Admitted**

19.     Defendant also states that it administers a page on the nba.com website directed to its content relating to news, promotional videos, highlights, links to purchase merchandise using Defendant's brand, and tickets. [Trechsel Decl., ¶ 7, Exh. 3, Defendant's Response to Int. no. 5.]

RESPONSE: **The Magic denies this statement because it mischaracterizes the evidence. The interrogatory response cited by Plaintiffs does not state that the Magic administers the page on nba.com.**

20.     Defendant posts audio-visual content on these accounts and its website for promotional purposes and fan engagement, including Infringing Uses. [Trechsel Decl., ¶¶ 2, 3(u), Exh. 1, at 231:19-233:2.]

RESPONSE: **The Magic denies this statement because it mischaracterizes the cited testimony, which says nothing about "Infringing Uses." The Magic admits that it posts audio-visual content on its social media accounts and team website for various purposes.**

21.     When creating its audio-visual content, including the Infringing Uses, Defendant recklessly used music without regard for its ownership or needing a synchronization license for its posted content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE: **The Magic denies this statement because it is a legal conclusion and not a statement of fact.**

22.     Defendant did not have a policy related to clearing copyrighted works for its content. [Trechsel Decl., ¶¶ 2, 3(r), (t), Exh. 1, at 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (d), Exh. 2, at 11:21-12:5; 21:5-10.]

RESPONSE: **The Magic denies this statement as worded because it is not temporally limited and the word "policy" is vague and ambiguous.**

23.     Defendant knew licenses were required to use third-party copyrighted materials. [Trechsel Decl., ¶¶ 2, 3(j), (k), Exh. 1, at 49:11-24, 50:7-17; 71:23-72:2.]

RESPONSE: **Admitted**

24.     Defendant had a library of licensed music through a third-party service. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1.]

RESPONSE: **Admitted**

25.     Defendant did not make copyright clearance inquiries before posting its content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE: **The Magic denies this statement as worded because it is not temporally limited or limited to the alleged Accused Uses here.**

26.     [Intentionally Omitted]

RESPONSE: **No response required.**

27.     On or around May 8, 2020, Kobalt engaged TuneSat, LLC ("TuneSat") to detect its and the other Plaintiffs' musical compositions in broadcasts of commercial content. [Declaration of Christopher Woods ("TuneSat Decl."), ¶ 3.]

RESPONSE: **The Magic admits this statement in part but denies this statement to the extent it purports to encompass TuneSat's full scope of engagement. *See* Ex. A**

28.     TuneSat is an independent audio monitoring service. [TuneSat Decl., ¶ 2.]

RESPONSE: **The Magic admits that TuneSat is an audio monitoring service but denies that it is "independent" because it works in conjunction with** ███████████████ ███████████████ **and at the direction of Kobalt for purposes of the Subject Uses. *See* Doc. 65 ¶¶ 6, 7, 9, 12; Ex. A, TuneSat-Kobalt Agreement; Ex. B, Woods Dep. Tr. at 20:14-**

**21:7, 28:20-29:12, 38:22-39:8, 102:7-15, 103:16-18, 143:21-23, 171:7-8, 172:1-4, 185:10-24, 219:11-220:2.**

29.   TuneSat's unique audio recognition technology monitors television and online content, helping rightsholders identify and collect the uses of their music. [TuneSat Decl., ¶¶ 2, 4.]

RESPONSE: **Admitted**

30.   TuneSat's technology creates "acoustic fingerprints" from client music recordings. [TuneSat Decl., ¶¶ 4-5.]

RESPONSE: **Admitted**

31.   It then runs those "acoustic fingerprints" against archived content stored by TuneSat. [TuneSat Decl., ¶ 4.]

RESPONSE: **Admitted.**

32.   TuneSat engages in quality control to validate detections of its clients' music. [TuneSat Decl., ¶ 8.]

RESPONSE: **Admitted**

33.   TuneSat's technology cannot find a detection if it does not have an "acoustic fingerprint" of a client's work. [TuneSat Decl., ¶ 7.]

RESPONSE: **The Magic denies this statement because TuneSat can detect uses of a song without an acoustic fingerprint from a specific client. Doc. 65 ¶ 13; *see also* Ex. C, TuneSat detection results.**

34.   TuneSat likewise cannot find a detection if TuneSat has not located and archived a particular channel of videos by a potential infringer. [TuneSat Decl., ¶ 7.]

RESPONSE: **The Magic admits that TuneSat cannot detect an audio fingerprint in a**

**potentially infringing use by a particular potential infringer if TuneSat has not located and
archived a channel containing potentially infringing uses.**

35.    On or around July 13, 2020, Kobalt retained the Kuhn Law Group ("Kuhn") to
advise and confirm whether TuneSat's detections amounted to infringement and to pursue those
claims once confirmed. [Declaration of Jessie Kuhn ("Kuhn Decl."), ¶¶ 2-3; Declaration of Erica
Carvajal Wong ("Wong Decl."), ¶ 3.]

RESPONSE: **Admitted. See Ex. D, KLG-Kobalt Agreement**

36.    TuneSat would provide Kuhn detections of the Plaintiffs' works. [Kuhn Decl., ¶
3; Wong Decl., ¶ 3.]

RESPONSE: **The Magic denies this statement as worded because TuneSat provides
Kuhn with access to a part of TuneSat's CSM database that allows Kuhn to view the
detections, not that TuneSat provides the detections. *See* ¶ 40; Doc. 65 ¶¶ 9, 12; Ex. C,
Woods Dep. Tr. at 139:1-22.**

37.    Then Kuhn would analyze whether licenses existed or whether there were other
reasonable defenses to infringement for each detection and, if not, Kuhn would seek recovery for
the infringing activity. [Kuhn Decl., ¶ 3; Wong Decl., ¶ 3.]

RESPONSE: **The Magic admits that Kuhn has sought recovery for alleged infringing
activity but lacks information sufficient to admit or deny any statements regarding Kuhn's
analysis.**

38.    In 2021, TuneSat started to provide Kuhn with detections of Plaintiffs' works in
Defendant's content posted to their website and social media accounts. [Kuhn Decl., ¶¶ 4-7, Exh.
1-2.]

RESPONSE: **The Magic denies this statement because there is no competent**

**summary judgment evidence supporting it. The cited paragraphs of the Kuhn declaration do not state that TuneSat began providing Kuhn with detections in 2021.**

39.    Kuhn received these detections and, seeing no licenses, fair use, or other applicable copyright defense, began notifying Defendant of the potentially infringing uses. [Kuhn Decl., ¶¶ 4-7, Exh. 1-2.]

RESPONSE: **The Magic admits that Kuhn notified it of potentially infringing uses but denies that there were no applicable copyright defenses.**

40.    Kuhn accessed these detections through TuneSat's case management system and, at that point, did their infringement review. [Kuhn Decl., ¶ 3; Wong Decl., ¶¶ 3-4.]

RESPONSE: **The Magic lacks sufficient information to admit or deny this statement.**

41.    After an initial confirmation in 2021 with Kobalt that Defendant did not have licenses for any of Plaintiffs' works, Kobalt authorized Kuhn to enforce detections they confirmed to be infringing without further input. [Kuhn Decl., ¶ 3]

RESPONSE: **The Magic lacks sufficient information to admit or deny this statement.**

42.    On March 8, 2021, an attorney at Kuhn sent the first letter to Defendant regarding Case 1:24-cv-05461-JSR Document 47 Filed 02/14/25 Page 8 of 12.]

RESPONSE: **Admitted**

43.    The March 8, 2021 letter contained no detections at issue in this dispute. [Kuhn Decl., ¶¶ 3-7, Exh. 1-2; cf. FAC, Exh. 1.]

RESPONSE: **Admitted**

44.    A Kuhn attorney sent another letter on July 19, 2021. [Wong Decl., ¶¶ 4-5, Exh. 3-4.]

RESPONSE: **Plaintiffs have no competent summary judgment evidence to prove this**

statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.

45.    The July 19, 2021 letter contained 42 detections of the Plaintiffs' music in the Defendant's content. [Wong Decl., ¶¶ 4-5, Exh. 3-4.]

RESPONSE: **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

46.    Of those 42 detections, only 10 are at issue in this dispute. [Wong Decl., ¶ 6.]

RESPONSE: **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

47.    For the 10 detections included in the July 19, 2021 Kuhn letter, Kuhn viewed those detections from TuneSat on July 19, 2021, and immediately sent out the letter on the same day. [Wong Decl., ¶¶ 4,7.]

RESPONSE: **Defendant lacks information sufficient to confirm or deny when Kuhn first viewed those detections. Furthermore, Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions. *See* Doc. 72 dated February 21, 2025.**

48.    Kuhn did not delay even one day between the new TuneSat detections becoming visible on their case management system and sending out the letter. [Wong Decl., ¶¶ 4, 7.]

RESPONSE: **Defendant lacks sufficient information to confirm or deny when Kuhn first viewed those detections. Furthermore, Plaintiffs have no competent summary**

**judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions.** *See* **Doc. 72 dated February 21, 2025.**

49.    On August 17, 2021, Kuhn sent another letter to Orlando, including a spreadsheet of detections, but removed one detection and did not include any additional detections. [Wong Decl., ¶ 8, Exh. 5-6.]

RESPONSE: **Plaintiffs have no competent summary judgment evidence to prove this statement because the Wong Declaration on which they rely was filed after the February 14, 2025 deadline for dispositive motions.** *See* **Doc. 72 dated February 21, 2025.**

50.    On December 2, 2021, Kuhn sent another letter to Orlando with an updated list of detections but no new detections. [Kuhn Decl., ¶ 8, Exh. 7-8.]

RESPONSE: **Admitted**

51.    On June 17, 2022, Kuhn sent a new letter containing 33 new detections received since the December 2, 2021 letter. [Wong Decl., ¶ 9, Exh. 9-10.]

RESPONSE: **Admitted**

52.    Kuhn sent a final letter on August 22, 2023, with an updated report removing four detections and adding one new detection. [Wong Decl., ¶ 10, Exh. 11-12.].

RESPONSE: **Admitted**

53.    Despite receiving numerous letters notifying them of their infringement over several years, Defendant failed to resolve this issue before the need for litigation. [Kuhn Decl., ¶¶ 3-8, Exh. 1-2, 7-8; Wong Decl., ¶¶ 4-10, Exh. 3-4, 5-6, 9-12.]

RESPONSE: **The Magic denies this statement because it is vague and ambiguous in that it purports to blame Defendant for "fail[ing] to resolve this issue before the need for**

**litigation."**

54.     Indeed, Defendant continued to infringe, uploading one of the Infringing Uses in 2023 and another in 2024. [Trechsel Decl., ¶¶ 2, 4(b), (v), Exh. 1, at 130:15-132:5; 157:23-158:5; 215:25-216:10; 195:15-196:3; ¶¶ 5, 6(f), Exh. 2, at 91:7-15.]

RESPONSE: **The Magic admits that it uploaded two of the videos alleged to be Infringing Uses in 2023 and 2024 respectively.**

55.     Of the 27 compositions, 16 peaked in the top 10 on the Billboard Hot 100 Chart, 24 have over 100 million total streams (including 5 with over 1 billion total streams), and 22 are certified Platinum or Diamond by the Recording Industry Association of America. [Trechsel Decl., ¶ 8, Exh. 4.]

RESPONSE: **The Magic lack information sufficient to admit or deny this statement.**

56.     Each of the 27 compositions appear on all primary streaming services, including Apple, Spotify, and Amazon. [Trechsel Decl., ¶ 8, Exh. 4.]

RESPONSE: **The Magic lack information sufficient to admit or deny this statement.**

57.     Defendant has failed to produce any evidence establishing that anyone other than Plaintiffs own the Subject Works. [Trechsel Decl., ¶ 9.]

RESPONSE: **The Magic admits that it has not produced evidence in this action regarding the ownership of the Subject Works.**

58.     During the Defendant's 30(b)(6) deposition, the deponent repeatedly testified that he recognized the Subject Work and that it sounded substantially similar to the song in the Infringing Use. [Trechsel Decl., ¶¶ 4, Exh. 1 (Krohmer Deposition Transcript, Exh. 3-38 therein); ¶¶ 5, 6(a), Exh. 2, at 5:5-10.]

RESPONSE: **Admitted**

17

59.    An ordinary observer hearing the Subject Work and the Infringing Use can hear the same song being played. [Trechsel Decl., ¶¶ 4, Exh. 1 (Krohmer Deposition Transcript, Exh. 3-38 therein).]

RESPONSE: **The Magic lack sufficient information to admit or deny this statement.**

60.    Defendant testified it is a sophisticated corporation. [Trechsel Decl., ¶¶ 2, 3(s), Exh. 1, at 228:9-13.]

RESPONSE: **The Magic admit that its corporate representative agreed that the Orlando Magic NBA team is a "sophisticated company in the area it does business in." The Magic denies this statement to the extent it is a legal conclusion and not a statement of fact.**

61.    Defendant testified that they did not have a policy in place regarding the use of third-party copyrights at the time the majority of the Infringing Uses were made, and even to this day continue to not have an official policy but simply a general understanding to be "mindful" of potential infringement. [Trechsel Decl., ¶¶ 2, 3(r), (t), Exh. 1, at 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (c), (d), Exh. 2, at 11:21-12:5; 16:16-17:19; 21:5-10.]

RESPONSE: **The Magic denies this statement to the extent it is taken out of context because the witness testified that questions related to licensing are directed to the Magic's general counsel. Ex. F, Feb. 11, 2025 Krohmer Dep. R. Tr. ("Krohmer Dep. Vol. 2") at 24:1–16; 25:1–14.**

62.    Defendant testified that they did not investigate who owned the music they were going to use prior to posting the content. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE: **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record. The Magic admits that it did not**

investigate the ownership of each of the Subject Works.

63.     Defendant testified that they did not investigate if they had a license or the right to use the content in online or social media posts. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE: **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record. The Magic admits that it did not investigate the ownership of each of the Subject Works.**

64.     Finally, Defendant testified that no one in its social media department was taught or trained on the proper way to obtain a license for music to use in social media posts. [Trechsel Decl., ¶¶ 2, 3(q), (r), (t), Exh. 1, at 148:3-9; 148:11-149:3; 230:23-231:11; ¶¶ 5, 6(b), (c), (d), Exh. 2, at 11:21-12:5; 16:16-17:19; 21:5-10.]

RESPONSE: **The Magic denies this statement because it mischaracterizes the cited testimony and is not supported by cites to the record.**

65.     The Orlando deponent indicated that Orlando had two sources from which to draw properly licensed music: 1) Orlando's own library of production music, Killer Tracks; or 2) the NBA's library of production music, United Masters. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1.]

RESPONSE: **The Magic denies this statement because it is not temporally limited, it mischaracterizes the cited testimony and is not supported by cites to the record.**

66.     By sourcing music outside of these libraries, in which Orlando could search and pull music directly, Orlando clearly knew that they were using unlicensed music and knew that a license was required. [Trechsel Decl., ¶¶ 2, 3(b), (c), (h), (i), (j), (k), Exh. 1, at 34:5-7, 34:14, 34:17-35:2; 36:3-19; 44:23-45:12; 46:3-47:1; 49:11-24, 50:7-17; 71:23-72:2.]

RESPONSE: **The Magic denies this statement because it is a legal conclusion, not a statement of fact, it mischaracterizes the testimony, and it is not supported by cites to the record. Indeed, the Magic believed that the use of the Subject Works in the Accused Uses was covered by the in-arena performance license or other through other means. Ex. F, Krohmer Dep. Vol. 2 at 23:15–19, 71:16-22, 72:8–11, 95:22-96:1, 96:3-5; Ex. G, Declaration of Lorenzo Guererro ("Guererro Decl.") ¶¶ 4-5; Ex. H, Declaration of Jeanine Klem-Thomas ("Klem-Thomas Decl.") ¶¶ 3-5.**

67.    Orlando did not try to investigate whether they correctly licensed the music in the Infringing Uses. [Trechsel Decl., ¶¶ 2, 3(n), (t), Exh. 1, at 142:20-143:12; 230:23-231:11.]

RESPONSE: **The Magic admits that they did not perform investigations with respect to each Subject Work.**

68.    Defendant has been the subject of copyright litigation for the infringing use of music in the past. [Trechsel Decl., ¶¶ 2, 3(l), Exh. 1, at 97:18-98.4.]

RESPONSE: **This statement mischaracterizes the cited testimony and does not rely on any admissible testimony. During his deposition, the Magic's corporate representative testified that he did not "know of any specifics" related to copyright infringement suits against the Magic. Ex. E, Jan. 23, 2025 Deposition Transcript of Geoff Krohmer ("Krohmer Dep. Vol. 1") at 99:21–24.**

69.    Defendant estimates its Twitter page averages 1,500 posts per month, going back to 2009. [Trechsel Decl., ¶¶ 5, 6(e), Exh. 2, at 82:23-83:11.]

RESPONSE: **The Magic denies this statement to the extent it is unsupported by any admissible evidence but otherwise admits this statement.**

70.    Defendant has, at minimum, eight active copyrights registered with the U.S. Copyright Office. [Trechsel Decl., ¶ 10, Exh. 41.]

RESPONSE: **Admitted**

71.    Defendant has, at minimum, thirty three active trademarks registered with the U.S. Trademark Office. [Trechsel Decl., ¶ 11, Exh. 42.]

RESPONSE: **Admitted**

**Plaintiffs' Responses to Defendant's Additional Statement of Facts 72-82**

72.    The Accused Uses in Exhibit 1 of the Complaint date back well over ten years ago. Ex. E, Krohmer Dep. Vol. 1 at 42:12–19. Only two of the Accused Uses were uploaded after 2020, with one uploaded in 2023 and one uploaded in 2024. See Plaintiffs' Motion at 12 & ¶ 54 above; Ex. G, Guererro Decl. ¶ 3; Ex. H, Klem-Thomas Decl. ¶ 3.

**Response:**

**Objection to the characterization that the Accused Uses in Exhibit 1 of the Complaint "date back well over ten years ago."  Defendant's evidence fails to establish when the Accused Uses were in fact posted.  Supp. Trechsel Decl. ¶ 2, Ex. 1, (42:18-43:8). Regardless, the date of *posting* is irrelevant as it pertains to the statute of limitations, which is governed by the "discovery rule." (*See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment (Dkt. 46) ("Plaintiffs' MPA"), at IV.A.)**

**Undisputed that one of the Accused Uses was uploaded in 2023, and one was uploaded in 2024.**

73.    Accused Uses Nos. 3, 4, and 19 in Exhibit 1 of the Complaint were created and posted in Brazil, by a marketing company, SAMBA Services ("SAMBA"), with whom the

Magic contract. Ex. I, Declaration of Geoff Alan Krohmer ("Krohmer Decl.") ¶¶ 3, 6. As part of their engagement, SAMBA's team in Brazil makes content that is posted on the Brazilian social media accounts. Id. ¶ 4. All content decisions are made by SAMBA and the content is physically posted by SAMBA's team located in Brazil. Id. ¶ 5.

**Response:**

**Defendant's numerous facts are devoid of context. SAMBA sources their content from Defendant's content library posted on its asset management system. Supp. Trechsel Decl. ¶ 2; Ex. 1, (149:16-18) ¶ 3; Ex. 2, (118:7-120:3).[2] There is no mention that the team in Brazil does anything to make content.   Additionally, the videos were recorded and posted to the asset management system in the United States. *Id*. at Ex. 2, (118:7-120:3). Defendant also testified that it saved and produced the videos at issue, took each of the videos down, and has them currently stored indicating that Defendant and not SAMBA created all of the content. *Id.* at (34:21-35:2; 93:6-22).**

**Defendant's additional statement does not create a genuine dispute of material fact. *See* Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment, at Section (I)(b)(i).**

74.    The Accused Uses were not posted as advertisements. See Ex. E, Krohmer Dep. Vol. 1 at 232:10–19. Nor is there any evidence that the Magic monetized the Accused Uses. *Id*. at 78:2–3. And while the Accused Uses contain music, the Magic understand that "there is a significant amount of social media users [] that view . . . their social media without sound on." Id. at 169:21–23.

---

[2] Though the Declaration of Frank Trechsel filed as docket number 55 had references to the deposition of Geoff Krohmer taken on February 11, 2025, all references to this deposition will be to the recent Declaration of Frank Trechsel, because, at the time of initial filing, Plaintiffs only had access to the rough transcript of the second Krohmer deposition.

**Response:**

Defendant's assertion that the Accused Uses were not posted as advertisements is not a material fact, but a legal conclusion. Moreover, it is contradicted by Defendant's testimony. The Infringing Uses are commercial uses, intended to advertise Defendant's brand. Defendant did indeed advertise, but did not make television advertisements because they had sold the rights to the broadcast to Fox Sports. Supp. Trechsel Decl. ¶ 2; Ex. 1, (27:14-28:9). Defendant continued to create advertisements and branding. *Id.* at (27:18-22). Defendant mostly used music from the production music library "Killer Tracks," which was purchased by Universal Music, to create this content. Supp. Trechsel Decl. ¶ 2; Ex. 1, (29:4-25; 34:5-35:2; 36:3-19). Defendant knew it needed a license for social media use or it would not obtain a license from "Killer Tracks." Supp. Trechsel Decl. ¶ 2; Ex. 1, (29:4-25; 34:5-35:2; 36:3-19). Defendant also stated that "player personality videos" posted to Tik Tok were made to "engage the fans" and to "market the team." Supp. Trechsel Decl. ¶ 2; Ex. 1, (168:11-169:2). Additionally, Defendant uses its "social media sites to market the Orlando Magic." *Id.* at (168:23-169:2). Defendant further stated that music can be used in content and/or arenas to evoke emotion, to set a mood for a video, and to create an entertaining atmosphere. *Id.* at (170:7-18; 171:12-20; 172:9-13). Defendant touts its 11.8+ Million social followers to market its partnership program, which helps businesses in part through reaching an engaged fanbase and by creating media impressions. *Id.* at ¶ 12, Ex. 5. By its own words, its social media presence directly helps itself and other businesses grow their business. *See id.*

Defendant's assertion that "[there is no] evidence that the Magic monetized the Accused Uses" is not established by the evidence presented. There is direct evidence that

Defendant monetized the Accused Uses. At points relevant to the Accused Uses, Defendant at minimum monetized its Twitter (now X) account and its YouTube account. Supp. Trechsel Decl. ¶ 2; Ex. 1, (78:22-79:6). Additionally, there is advertising on the NBA.com website, on which other uses were posted. *Id.* at (79:7-80:19). Defendant further understands that top 40 music and production music are different and that it generally costs a lot less to use production music than to use top 40 songs. *Id.* at (109:21-110:18). It, thus, understood that using Plaintiffs' top 40 music would derive great economic benefit by using more popular and valuable music at no cost.

The statement that "there is a significant amount of social media users [] that view… their social media without sound on" is irrelevant and unsubstantiated. Defendant has failed to establish an adequate foundation for Krohmer's opinion. When asked if there was any data or studies to verify this, Defendant said that it did not have any. Supp. Trechsel Decl. ¶ 2, Ex. 1, (169:19-170:6). Defendant also stated that "there is a universe of users that do listen with sound on." *Id.* at (170:7-10). Many of the videos used the song throughout the entire runtime of the video and/or used substantial portions of the songs. Supp. Trechsel Decl. ¶¶ 4, 7-8. Twenty-eight of the thirty-one Infringing Uses that contained lyrics in the Infringing Use used the chorus, and two of the three that did not synced the images to directly align with the words in the lyrics. *Id.* Some of the Infringing Uses were choreographed dance routines to the music. *Id.*

Defendant's additional statement does not create a genuine dispute of material fact.

75.    Although the Magic had a library of production music (through Killer Tracks), that library was for "broadcast and radio use," and "at that time, video was barely even posted on the internet." Ex. F, Krohmer Dep. Vol. 2 at 40:22-41:7. It was not until 2018 or 2019 that social

media was even included in the Killer Tracks agreement, and it was only included for paid

"advertising purposes," which would not include the Accused Uses. *Id*. at 41:9-21.

**Response:**

      **At the time Defendant had the Killer Tracks library, it understood that people who**

**own a copyright can decide whether or not people can use their music. Supp. Trechsel Decl.**

**¶ 2; Ex. 1, (50:7-11). It additionally understood that it needed a Killer Tracks license to use**

**music in their catalogue. *Id.* at (50:13-17). Further, Defendant did not think it has "the**

**rights or authority to take [] music from YouTube and put it in [Defendant's] productions**

**without getting a license from the owners of that music." *Id.* at (49:11-17).**

      **For the foregoing reasons, Defendant's additional statement does not create a**

**genuine dispute of material fact.**

      76.    During the time that all but two of the Accused Uses were posted, the Magic's

understanding was that the "performance license would have covered any of the use[s]" of the

Subject Works in the Accused Uses. Ex. F, Krohmer Dep. Vol. 2 at 95:22-96:1. Magic

employees believed that "something that was captured in arena during one of [their] games," was

"covered under [the team's] performance license in arena." *Id*. at 23:15–19. At that time, they

believed that the Magic's "license with the NBA and performance license," gave them clearance

to use the music in the Subject Works. *See Id*. at 71:16-22. The general understanding of Magic

employees was that they had a "blanket license for in arena use" of songs. *Id*. at 72:8–11. The

Magic's corporate representative testified that the Magic are not aware of anyone who posted a

video that thought he or she was not permitted to do so. *Id*. at 96:3-5.

**Response:**

      **Defendant's assertion as to its purported understanding that the "performance**

license would have covered any of the use[s]" is not established by competent evidence, but rather Defendant's counsel's cross-examination, to which Plaintiffs objected as having been asked and answered.  Supp. Trechsel Decl. ¶ 3; Ex. 2, (95:11-96:1).  Defendant's next assertion regarding the belief of Magic *employees* (plural) is similarly not established by competent evidence and intentionally devoid of context.  Krohmer's testimony relates to his recollection of *one* employee's purported belief that *one* video could have been covered by a performance license, which purported understanding was indeed incorrect. *Id.* at (23:12-22.)

Defendant repeatedly testified that it did not provide or receive basic training on what licenses were needed to use music in a video or provide any manuals or other information on how to license sound recordings, because "[w]e would defer to our legal team." Supp. Trechsel Decl. ¶ 2; Ex. 1, (147:17-148:18). Despite this, there was not typically a lawyer in the room when content creators were making videos, and content creators "generally do not send videos to our legal team, no." *Id.* at (148:20-149:3). Additionally, Defendant has still not attempted to implement policies and procedures to ensure it is respecting the rights of copyright holders. *See* Supp. Trechsel Decl. at ¶ 3; Ex. 2, (13:24-14:9; 17:15-23; 18:7-19:10; 20:25-21:18; 22:24-23:10; 29:4-30:5).

For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.

77.     According to the Magic corporate representative, there "is a different understanding now than there [] was in the past" with respect to what music a user could post to social media. *Id*. at 48:4-15. Magic employees posted Accused Works on "platforms [that] did allow and enable users to use certain music in their content," whereas now, "the platforms . . .

will prevent [] specific uses of music that they previously did not." *Id*. at 48:10–25.

**Response:**

      **Defendant fails to provide competent evidence that indicates what the "different" beliefs were that it had with respect to the use of music on Social Media in the past compared to the present. Defendant repeatedly testified that it did not provide or receive basic training on what licenses were needed to use music in a video or provide any manuals or other information on how to license sound recordings, because "[w]e would defer to our legal team." Supp. Trechsel Decl. ¶ 2; Ex. 1, (147:17-148:18). Despite this, there was not typically a lawyer in the room when content creators were making videos, and content creators "generally do no send videos to our legal team, no." *Id.* at (148:20-149:3). Defendant also understood that it could not take a song from YouTube and post it in its content without a license. *Id.* at (49:11-17). Additionally, its content creators did not read the user agreements at the time the videos were made to verify if their purported misunderstanding of the rights granted were correct. Supp. Trechsel Decl. at ¶ 3; Ex. 2, (61:7-11). Even after being notified of the Accused Uses, Defendant failed to adopt policies and procedures to ensure intellectual property was being protected, resulting in multiple Accused Uses being created well after Defendant was on notice. *Id.* at (61:25-62:16).**

      **For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.**

      78.    For example, the Magic understood that TikTok "allowed all accounts including commercial to use any music on their platform," because users had the "ability to [] insert the music within the app. It was the understanding that [] TikTok likely had the license that would allow accounts to do [that]." *Id*. at 50:10–18. This is what happened when a Magic employee

posted an Accused Use in 2024. Ex. H, Klem-Thomas Decl. ¶¶ 3, 4. The employee "uploaded a picture to the Instagram Application, where [she] was given the option . . . to insert the music in the video." *Id.* ¶ 5. The employee "believed this music was cleared for the [] Magic's use by Instagram because there was no warning regarding this feature not being usable by the [] Magic or needing to obtain any additional license to use this music in this Instagram Story." *Id.*

**Response:**

**Defendant repeatedly testified that it did not provide or receive basic training on what licenses were needed to use music in a video or provide any manuals or other information on how to license sound recordings, because "[w]e would defer to our legal team." Supp. Trechsel Decl. ¶ 2; Ex. 1, (147:17-148:18). Despite this, there was not typically a lawyer in the room when content creators were making videos, and content creators "generally do no send videos to our legal team, no." *Id.* at (148:20-149:3). Defendant also understood that it could not take a song from YouTube and post it in its content without a license. *Id.* at (49:11-17). Additionally, its content creators did not read the user agreements at the time the videos were made to verify if their purported misunderstanding of the rights granted were correct. Supp. Trechsel Decl. at ¶ 3; Ex. 2, (61:7-11). Even after being notified of the Accused Uses, Defendant failed to adopt policies and procedures to ensure intellectual property was being protected, resulting in multiple Accused Uses being created well after Defendant was on notice. *Id.* at (61:25-62:16).**

**Defendant further testified that it did not look into whether Tik Tok had a license, nor did it look at any user agreement. *Id.* at (50:19-25).**

**For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.**

79.     In 2023, a Magic employee posted an Accused Use after he "searched in the YouTube Application for royalty-free music and found the instrumental track that [he] inserted into the video, which [he] believed was cleared for the [] Magic's use." Ex. G, Guererro Decl. ¶ 4. At the time, he "did not believe this track was the Meek Mill song 'I'm a Boss'" rather, he "thought it was a similar sounding instrumental track that was pre-cleared by YouTube for use by all YouTube users. *Id.* ¶ 5.

**Response:**

**Defendant repeatedly testified that it did not provide or receive basic training on what licenses were needed to use music in a video or provide any manuals or other information on how to license sound recordings, because "[w]e would defer to our legal team." Supp. Trechsel Decl. ¶ 2; Ex. 1, (147:17-148:18). Despite this, there was not typically a lawyer in the room when content creators were making videos, and content creators "generally do no send videos to our legal team, no." *Id.* at (148:20-149:3). Defendant also understood that it could not take a song from YouTube and post it in its content without a license. *Id.* at (49:11-17). Additionally, its content creators did not read the user agreements at the time the videos were made to verify if their purported misunderstanding of the rights granted were correct. Supp. Trechsel Decl. at ¶ 3; Ex. 2, (61:7-11). Even after being notified of the Accused Uses, Defendant failed to adopt policies and procedures to ensure intellectual property was being protected, resulting in multiple Accused Uses being created well after Defendant was on notice. *Id.* at (61:25-62:16).**

**For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.**

80.     After discovery in this action closed, Plaintiffs belatedly produced hand-picked

examples of social media licenses between Kobalt on the one hand, and Facebook, Meta, Google, and TikTok on the other. Ex. J, Kobalt-Facebook Agreement (KOBALT_ORLANDO001487-KOBALT_ORLANDO_001510); Ex. K, Kobalt-Meta Agreement (KOBALT_ORLANDO001511-KOBALT_ORLANDO_001532); Ex. L, Kobalt-TikTok Agreement (KOBALT_ORLANDO001533-KOBALT_ORLANDO_001545); Ex. M, Kobalt-Google Agreement (KOBALT_ORLANDO001546-KOBALT_ORLANDO_001585) *see also* Supplemental Declaration of Benjamin T. Pendroff ¶ 3. These licenses contain language indicating that the Accused Uses ████████████████████ and therefore did not infringe. *See, e.g.*, Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001546, Sec. 1.1; Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001552–53, Secs. 2.1, 2.3.

**Response:**

 **Pursuant to Judge Rakoff's order entered on March 6, 2025, Defendant is foreclosed from raising the social media licenses on summary judgment. Defendant's use of these agreements was solely preserved as a possible defense at and after trial by Defendant's own assertion. Supp. Trechsel Decl. ¶ 11, Ex. 4.**

 **Plaintiffs responded to Defendant's Second Set of Requests for Production the day they were due. One day before the close of discovery. Plaintiffs objected to the requests. Kobalt's production was not late. Defendant sought to compel production of licenses Kobalt entered into with different social media companies, after the close of discovery. The Court order that Plaintiff produce four exemplars of the agreements. Plaintiffs obeyed the Court's Order. Supp. Trechsel Decl. ¶ 9.**

 **On February 13, 2025, Defendant filed a letter motion, seeking to compel production of additional agreements. Plaintiffs responded to the motion on February 14,**

2025. On February 14, 2025, Judge Rakoff issued a decision denying Defendant's request. The Court stated, "Upon careful review, the Court adheres to its initial inclination that the contracts in question do not contain relevant material." Supp. Trechsel Decl. ¶ 10, Ex. 3.

On March 5, 2025, Judge Rakoff ruled that Defendant could amend its answer "given [Defendant's] assurances that it requests leave to amend 'for the limited purpose of preserving the Magic's defenses at and after trial,' and that it 'does not seek leave to revise the parties' already-filed Motions for Summary Judgment, to delay these proceedings, or for any other purpose.'" Supp. Trechsel Decl. ¶ 11, Ex. 4.

Plaintiffs only cite to "Ex. M, Kobalt-Google Agreement" to support its claim that

███████████████████████████████████████████████████████████

████████████████████████████████ Therefore, there is no evidence that the

Meta or TikTok agreements also contain language that would purportedly allow Defendant's Use of the Subject Works.

For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.

81.    Kobalt's agreement with Google (which covers YouTube) contains an ██████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See*

Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001554, Sec. 2.6.

**Response:**

Pursuant to Judge Rakoff's order entered on March 6, 2025, Defendant is foreclosed from raising the social media licenses on summary judgment. Defendant's use of these agreements was solely preserved as a possible defense at and after trial by Defendant's own

assertion. Supp. Trechsel Decl. ¶ 11, Ex. 4.

This agreement does not 

Defendant's Ex. M, Kobalt-Google Agreement, at KOBALT_ORLANDO_001554, Sec. 2.6.

. *Id.* That is not the case here. *Id.*

*Id.* Further, these videos

. Supp.

Trechsel Decl. ¶ 2; Ex. 1, (27:14-28:9, 29:4-25; 34:5-35:2; 36:3-19, 168:11-169:2, 170:7-18; 171:12-20; 172:9-13).

For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.

82.    However, Plaintiffs did not produce social media agreements covering all of the years of the relevant Accused Uses. Supplemental Declaration of Benjamin T. Pendroff ¶ 3.

**Response:**

Pursuant to Judge Rakoff's order entered on March 6, 2025, Defendant is foreclosed from raising the social media licenses on summary judgment. Defendant's use of these

agreements was solely preserved as a possible defense at and after trial by Defendant's own assertion. Supp. Trechsel Decl. ¶ 11, Ex. 4.

Plaintiffs have complied with all Court orders related to the production of these agreements, and the Court specifically denied Defendant's attempt to compel the production of further agreements. Supp. Trechsel Decl. ¶ 10, Ex. 3.

For the foregoing reasons, Defendant's additional statement does not create a genuine dispute of material fact.

### Plaintiffs' Response to Defendant's Procedural and Evidentiary Objections

Defendant raises several procedural and evidentiary objections in its Response Statement, each of which either mischaracterizes the evidence presented or has been corrected. As such, the objections should be disregarded, as they fail to show how Plaintiffs have been unable to support each factual contention with "evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." Local Rules section 56.1(d).

In its Response Statement, Defendant claims the Declaration of Caitlyn Miles was rendered defective, because reference to the APG Declaration in Plaintiffs' Statement of Material Facts (Dkt. 47) was made to Brett Copell rather than Caitlyn Miles, and Brett Copell's name appeared once in Ms. Miles Declaration. Def. Response SOMF ¶¶ 2, 7. This was merely a typographical error, as the Declaration was properly signed by Ms. Miles, the caption contained Ms. Miles' name, and the Docket Entry was listed under Ms. Miles' name. Dkt. 48. This error does not render the entire declaration inadmissible, and has been corrected for the record, making it both admissible now, and anticipatorily admissible for trial, if necessary[3]. Dkt. 92, 92-1, 92-2.

---

[3] Courts regularly accept and consider corrected declarations on reply, in lieu of procedurally deficient declarations. *TR 39th St. Land Corp. v. Salsa Distribution USA, LLC*, No. 11CV7193 DF, 2015 WL 1499173, at *2 (S.D.N.Y. Mar. 25, 2015); *See e.g., Dilonez v. Fox Linen Serv. Inc.,* 35 F.Supp.3d 247, 253 (E.D.N.Y.2014) (noting that undated declarations did not comply

Defendant further objects that the Declaration of Diana Sanders ("Sanders Decl.") is rendered defective by statements made "on information and belief." Def. Response SOMF ¶¶ 2, 6, 12. Ms. Sanders' declaration states clearly that ███████████████████████ ███████████████████████████████████████████ The only statements Ms. Sanders made █████████████████████████████ ████████████████████████████ These facts are not genuinely in dispute as ███████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ The remainder of her testimony is made with personal knowledge and supplemented by the relevant documents. Further, Ms. Sanders's ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████

Defendant also objects to the Declaration of James Arnay (Dkt. 50, "Arnay Decl."), claiming it was defective in providing the chain of title for KMA Assets I LP and KMA Assets II Limited's respective rights in their respective Subject Works, because it states that different parties were the initial purchaser of the relevant underlying asset purchase agreements for the

---

with Section 1746, but still considering them where declarations that were in compliance with the statutory requirements were resubmitted with the reply); *Wausau Underwriters Ins. Co. v. Osborne Transformer Corp.,* No. 1 lcv819A, 2013 WL 6328104, at *2 n. 4 (W.D.N.Y. Dec. 5, 2013) (finding that the inclusion of the necessary language from Section 1746 in an amended declaration that was submitted with the reply corrected the deficiency of the original declaration); *see also Cuoco v. Hershberger,* No. 93cv2806 (AGS), 1996 WL 648963, at *3 (S.D.N.Y. Nov. 6, 1996) (accepting resubmitted declarations with correct dates to correct the technical deficiencies of the declarations originally submitted); *Citizens Banking Co. v. McKittrick,* No. 90cv2532 (JSM), 1991 WL 79153, at *1 (S.D.N.Y. May 6, 1991) (noting that, in plaintiffs reply papers, plaintiff "cure[d] the omission of a statement of personal knowledge").

songs "A Little Party Never Killed Nobody (All We Got)" and "I Love It (feat. Charli XCX)."

Def. Response SOMF ¶¶ 2, 6, 13, 14. While it is true that ██████████████████████

███████████ was the initial purchaser for the former, and ███████████████████████

███████████ was the initial purchaser for the latter, this in no way renders Mr. Arnay's declaration

defective, as the declaration details exactly how the assets were transferred to KMA Assets I LP

and KMA Assets II Limited "through intercompany agreements." SOMF ¶ 16 (citing Arnay

Decl. (Dkt. 50), ¶¶ 3-21). The writer for "A Little Party Never Killed Nobody (All We Got),"

Kamaal Ibn John Fareed, sold his catalogue of music to ███████. Arnay Decl. (Dkt. 50), ¶ 15, Ex.

10. ████████████████████████████████████████████ through

an ███████████████████████████. Arnay Decl. (Dkt. 50), ¶ 16, Ex. 11. ███████████

███████████████████████ through a ████████████████████. Arnay

Decl. (Dkt. 50), ¶ 17, Ex. 12. ████████████████████████████████████████

through a ███████████████████. Arnay Decl. (Dkt. 50), ¶ 18, Ex. 13. ████████████

███████████████████████ through a Copyright Assignment Agreement.

Arnay Decl. (Dkt. 50), ¶ 19, Ex. 14. KMA Assets I LP is the current and ultimate rights holder.

The writer for the song "I Love It (feat. Charli XCX)," Patrik Berger, transferred rights to the

song to ███████████████████ through an ████████████████

███████. Arnay Decl. (Dkt. 50), ¶ 10, Ex. 5. This was transferred to ██████████████████

███████████████ by ██████ through an ███████████████████████. Arnay Decl.

(Dkt. 50), ¶ 11, Ex. 6. KMA Assets II Limited purchased the rights from ███████ in an ████████

███████████████, to which both ████████████████ were seller parties. Arnay Decl.

(Dkt. 50), ¶ 12, Ex. 7. The transfers that granted KMA Assets I LP and KMA Assets II Limited

rights to the above songs were clearly outlined in Mr. Arnay's declaration, as well as in the

Statement of Material Facts. SOMF ¶ 16. Thus, Defendant's objection has no basis.

Finally, Defendant objects to the Declaration of Erica Carvajal Wong (Dkt. 72-1, "Wong Decl."), and the exhibits attached thereto, because the Declaration was filed late when a duplicate of the Declaration of Jessie Kuhn was inadvertently filed in its place. *But see,* Def. Response SOMF ¶¶ 51-52 (admitting facts that solely refer to the Wong Declaration and Exhibits 9-12). Though it was mistakenly filed, it was corrected one week before Defendant's Opposition deadline. Further, a similar declaration was submitted by Ms. Wong in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. This declaration was filed timely and without error. Opp. Wong Decl. (Dkt. 91). Additionally, the Exhibits attached thereto were timely filed, which can all be authenticated through different means. *See* Dkt. 57. For example, the July 19, 2021 letter (Ex. 1 to Wong Decl.) can be authenticated as an Exhibit to Geoffrey Krohmer's Deposition to which Defendant cites. Supp. Trechsel Decl., ¶ 3, Ex. 2, (58:14-59, Ex: 12). Each of the Exhibits were emails and spreadsheets sent to Defendant years prior. Defendant even required Plaintiffs to authenticate the spreadsheets in their Requests for Admission. There is thus no legitimate dispute as to the authenticity of the documents, and thus, no reason to strike their entry.

Defendant also misrepresents the evidence related to Exhibits 3-1 and 38-1. First, Defendant admits that "During the Defendant's 30(b)(6) deposition, the deponent repeatedly testified that he recognized the Subject Work and that it sounded substantially similar to the song in the Infringing Use." SOMF ¶ 58. To support this fact, Plaintiffs refer to Paragraph 4 of the Declaration of Frank Trechsel, which states that for each video played attached as Exhibits 3-38, the corresponding audio was 3-1-38-1. *Id.*; Trechsel Decl. ¶ 4(a)-(kk). The MP3's are plainly cited to in the record for Plaintiffs fact number 58 above and in Plaintiffs' Separate Statement

(Dkt. 47). There is no basis to strike the audio from the record.


DATED: March 7, 2025

By    */s/* Douglas Johnson

_____

Douglas Johnson

**JOHNSON & JOHNSON LLP**
Douglas L. Johnson (Admitted Pro Hac Vice)
Frank R. Trechsel (Admitted Pro Hac Vice)
439 N. Canon Dr. Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
Email:  djohnson@jjllplaw.com
        ftrechsel@jjllplaw.com