**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | Case No: 1:24-cv-05461-JSR |
| **ARTIST PUBLISHING GROUP, LLC dba APG, a Delaware Limited Liability Company; FIRST-N-GOLD PUBLISHING, INC., a Florida Corporation; LUKASZ GOTTWALD an individual doing business as KASZ MONEY PUBLISHING; KMA ASSETS I LP, a Delaware Limited Partnership; KMA ASSETS II LIMITED, a United Kingdom Private Limited Company; KOBALT MUSIC PUBLISHING AMERICA, INC. dba KMPA, a Delaware Corporation; MXM MUSIC AB dba MXM, a Swedish Limited Liability Company; NOTTING HILL MUSIC, INC., a New York Corporation; and PRESCRIPTION SONGS, LLC, a California Limited Liability Company,** | **MEMORANDUM OF POINTS AND AUTHORITIES OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **Plaintiffs,** | |
| **vs.** | |
| **ORLANDO MAGIC, LTD. dba ORLANDO MAGIC, a Florida Limited Partnership; and DOES 1-10, inclusive,** | |
| **Defendants.** | |

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION …………………………………………...…………………1

FACTUAL BACKGROUND ……………………………………………...……1

    **I.**     **TuneSat is not Plaintiffs' agent** …………………………………...………2

    **II.**    **Kobalt's relationship with Kuhn** ………………………………………....5

    **III.**   **Detection of potentially infringing uses by TuneSat leads to discovery of the Infringing Uses by Kuhn** …………………………………...……...…6

ARGUMENT ……………………………………………...……………………6

    **I.**     **Standard of Review** …………………………………………………...……6

    **II.**    **Plaintiffs' cause of action for direct copyright infringement is timely** …...…7

        **A.** **TuneSat is not Plaintiffs' agent** ………………………………………8

                **a.**  **Plaintiffs' did not consent to TuneSat acting as their agent** ……...9

                **b.**  **TuneSat did not consent to act as Plaintiffs' agent** ……………...13

                **c.**  **Kobalt did not control the services TuneSat rendered** ……….…14

        **B.** **TuneSat's knowledge cannot be imputed upon Plaintiffs** ……………16

        **C.** **No material time passed between when Kuhn learned of the Infringing Uses and made a legal determination of infringement** ………………...17

        **D.** **Even if the Court concludes that TuneSat was Kobalt's agent, when TuneSat discovered or should have discovered the infringements is an issue of fact** ……………………………………………………...……18

                **a.**  **Sixteen uses were not "found" prior to July 19, 2021** ……………19

                **b.**  **Defendant fails to meet its burden that Plaintiffs should have known about 12 Infringing Uses before July 19, 2021** ………...…22

    **CONCLUSION** …………………………………………………………..24

# TABLE OF AUTHORITIES

**Cases**

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F.Supp.2d 372 (S.D.N.Y. 2010).......................................... 9

*Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
   347 F.3d 448 (2d Cir. 2003)................................................ 8

*EBC I, Inc. v. Goldman Sachs & Co .*,
   5 N.Y.3d 11 (2005)...................................................... 13

*Elbit Systems, Ltd. v. Credit Suisse Group*,
   917 F.Supp.2d 217 (S.D.N.Y.2013)...................................... 9, 13

*Highland Cap. Mgmt. LP v. Schneider*,
   607 F.3d 322 (2d Cir. 2010)............................................. 9

*In re Ames Dep't Stores, Inc.*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002).................................... 14

*In re JVJ Pharm., Inc.*,
   630 B.R. 388 (S.D.N.Y. 2021)....................................... 8, 12, 13

*In re Parmalat Sec. Litig.*,
   684 F. Supp. 2d 453 (S.D.N.Y. 2010).................................... 19

*In re Shulman Transp. Enterprises, Inc.*,
   744 F.2d 293 (2d Cir. 1984)............................................. 9

*Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*,
   399 F.Supp.3d 120 (S.D.N.Y. 2019)..................................... 16

*Lavastone Cap. LLC v. Coventry First LLC*,
   No. 14-CV-7139, 2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015) ............ 13

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Services*,
   388 F.Supp.2d 292 (S.D.N.Y. 2005)...................................... 8

*Merchant v. Levy*,
   92 F.3d 51 (2d Cir. 1996)............................................... 7

*Mid–Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*,
   276 F.3d 123 (2d Cir. 2002)............................................. 14

*Minden Pictures, Inc. v. Conversation Prints, LLC*,
   No. 20-12542, 2022 WL 4667967 (E.D. Mich. Sept. 30, 2022)............. 18

*Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*,
   657 F.Supp. 1475 (S.D.N.Y.1987) ..................................................... 14

*Mouwad Nat. Co. v. Lazare Kaplan Intern, Inc.*,
   476 F.Supp.2d 414 (S.D.N.Y. 2007).............................................. 14, 15

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
   182 F.3d 157 (2d Cir. 1999)............................................................... 6

*Nieblas-Love v. New York City Housing Authority*,
   165 F.Supp.3d 51 (2016). ................................................................. 7

*Northern Shipping Funds I, LLC v. Icon Capital Corp.*,
   921 F.Supp.2d 94 (S.D.N.Y. 2013) ............................................. 11, 13

*Parisienne v. Scripps Media, Inc.*,
   No. 19 CIV. 8612 (ER), 2021 WL 3668084 (S.D.N.Y. Aug. 17, 2021) ................................. 17

*Peltz v. SHB Commodities, Inc.*,
   115 F.3d 1082 (2d Cir.1997).............................................................. 9

*Precedo Cap. Group Inc. v. Twitter Inc.*,
   33 F.Supp.3d 245 (S.D.N.Y. 2014) ..................................................... 9

*Psihoyos v. John Wiley & Sons, Inc.*,
   748 F.3d 120 (2d Cir. 2014)............................................................... 7

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   280 F.R.D. 130, 141 (S.D.N.Y. 2012) .............................................. 16

*Ritchie Capital Mgmt., LLC v. Coventry First LLC*,
   No. 07 Civ. 3494, 2007 WL 2044656 (S.D.N.Y. July 17, 2007) ............................. 14

*Sellify Inc. v. Amazon.com, Inc.*,
   2010 WL 4455830  (S.D.N.Y. 2010).................................................. 12

*Sohm v. Scholastic Inc.*,
   959 F.3d 39, 50 (2d Cir. 2020)............................................................ 7

*Star Energy Corp. v. RSM Top–Audit*,
   No. 08 Civ. 00329, 2008 WL 5110919, at *2 (S.D.N.Y. Nov. 26, 2008) ................... 14

*Supreme Showroom, Inc. v. Branded Apparel Group LLC*,
   2018 WL 3148357 (S.D.N.Y. 2018).................................................. 12

*Veal v. Geraci*,
   23 F.3d 722 (2d Cir. 1994)............................................................... 16

*Veleron Holding, B.V. v. Morgan Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015) ................................................................. 13

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
   381 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................................. 16

**Statutes**

17 U.S.C. § 507(b) ................................................................................................ 7
Fed. R. Civ. P. 56(c). ............................................................................................ 6

**INTRODUCTION**

Orlando Magic, Ltd. ("Defendant" or "Orlando") infringed Plaintiffs' musical compositions. Defendant attempts to escape liability for 28 of its infringements by arguing third-party TuneSat, LLC acted as Plaintiffs' agent, imputing knowledge to Plaintiffs to extend Plaintiffs' discovery of Defendant's wrongdoing outside the statute of limitations. The hallmarks of an agency relationship are mutual consent and control. Defendant fails to meet their burden to prove either.

First, Plaintiffs did not employ TuneSat as an agent in an agreement or as a matter of practice. Second, TuneSat did not accept such an obligation, as the fiduciary duties imposed upon an agent extend well beyond the types of services TuneSat performs and is willing to undertake on behalf of its clients. Third, TuneSat remained in control of its detection services throughout the relationship. As a matter of law, the Court should find no agency relationship exists. Accordingly, TuneSat's knowledge cannot be imputed upon Plaintiffs.

Orlando also argues Plaintiffs should have known of the alleged infringements through the exercise of due diligence earlier than three years before they filed suit. But Defendant fails to identify the date upon which it contends Plaintiffs or TuneSat did or should have discovered the alleged infringements for the statute of limitations to accrue. Defendant states in conclusory fashion that Plaintiffs should have discovered the infringements earlier than July 19, 2021. It does not provide any facts or evidence to show that TuneSat or Plaintiffs could have discovered the infringements sooner with greater diligence.

Because Plaintiffs did not have an agency relationship with TuneSat, and TuneSat's knowledge cannot be imputed upon Plaintiffs, Plaintiffs knowledge of any infringement began on July 19, 2021. Defendant cannot meet its burden to show that Plaintiffs should have discovered any infringements before that date. Defendant's motion should be denied.

**FACTUAL BACKGROUND**

Defendant infringed and infringed willfully on Artist Publishing Group, Lukasz Gottwald dba Kasz Money Publishing, KMA Assets I LP, KMA Assets II Limited, Kobalt Music

1

Publishing ("Kobalt"), MXM Music AB, Notting Hill Music, Inc., and Prescription Songs LLC's (collectively "Plaintiffs") copyrights in videos posted on Defendant's websites and social media profiles to benefit its brand. Defendant attempts to escape liability on an unsound statute of limitations argument that has no basis in fact or law.

Plaintiffs are music publishers and administrators who control an extensive catalog of musical compositions. Plaintiffs' Separate Statement of Additional Material Facts ("PAMF") ¶ 42. Of that catalog, 27 distinct compositions (the "Subject Works") are at issue. PAMF ¶ 43. Defendant owns and operates the National Basketball Association team, the Orlando Magic. PAMF ¶ 44. Plaintiffs allege Defendant exploited the Subject Works without regard for Plaintiffs' rights in 36 videos posted online and on social media (the "Infringing Uses"). PAMF ¶ 45.

In 2020, ████████████████████████████████████████████ ████████████████████████. PAMF ¶ 46. Also, in 2020, ████████████████ ████████████████████████████████████████. PAMF ¶ 47. The first date that Plaintiffs became aware of any Infringing Uses was July 19, 2021 when Plaintiffs' agent, Kuhn, reviewed the detected uses and concluded that Orlando had infringed KMPA's copyrights. PAMF ¶ 48.

## I. TuneSat is not Plaintiffs' agent

On May 8, 2020, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ PAMF ¶ 49. TuneSat is an independent audio monitoring service and data provider. PAMF ¶ 50. TuneSat's proprietary audio recognition technology monitors television and online content, helping rightsholders identify uses of their music. PAMF ¶ 51. It locates uses of its clients' music online and supplies its clients with information about those uses. PAMF ¶ 52. TuneSat does not provide legal advice or services. PAMF ¶ 53. Instead, it merely provides the data its clients then use to enforce their rights. PAMF ¶ 54.

TuneSat's technology creates "acoustic fingerprints" from clients' music. PAMF ¶ 55. It

then runs those "acoustic fingerprints" against archived content stored by TuneSat. PAMF ¶ 56.

TuneSat engages in quality control to validate detections of its clients' music. PAMF ¶ 57.

TuneSat's technology cannot find a detection if it does not have an "acoustic fingerprint" of a

client's work. PAMF ¶ 58. TuneSat likewise cannot find a detection if TuneSat has not located

and archived media for analysis. PAMF ¶ 59. Only by comparing the "acoustic fingerprint"

against the archived media can TuneSat's technology detect potential infringements. PAMF ¶ 60.



PAMF ¶ 61. Kobalt did not direct TuneSat to investigate any potential infringers outside of those

TuneSat brought to Kobalt for approval. PAMF ¶ 62. ███████████████████

████████████████████████████████ PAMF ¶ 63. █████████

█████████████████████████████████

██████████████████████████████████

██████████████ PAMF ¶ 64. Without this authority, TuneSat's services are limited to detecting

uses of Plaintiffs' music. PAMF ¶ 65.

Indeed, TuneSat never contacted a potential infringer on behalf of Kobalt, including

Defendant. PAMF ¶ 66. TuneSat never attempted to restrain the conduct of a potential infringer

on behalf of Kobalt. PAMF ¶ 67. TuneSat likewise never tried to independently monetize any

potential infringements on behalf of Kobalt. PAMF ¶ 68. TuneSat has never directly or indirectly

entered or engaged in any settlement negotiations on behalf of Kobalt. PAMF ¶ 69. Similarly,

TuneSat never proposed or approved any settlement agreements involving Kobalt. PAMF ¶ 70.

Generally, TuneSat is informed of a settlement by either Kobalt or its attorneys. PAMF ¶

71. Kobalt conveys this information so TuneSat can either cease or modify its data collection

related to the settling matter. PAMF ¶ 72. ██████████████████████

████████████████████████████████████

███████████ PAMF ¶ 73. In this litigation, █████████████████████.

PAMF ¶ 74.

TuneSat has never administered Kobalt's music rights. PAMF ¶ 75. TuneSat's relationship with Kobalt is limited to providing Kobalt with detections and related data of Plaintiffs' music. PAMF ¶ 76. Indeed, ███████████████████████████████ ███████████████████████████████████████████████████:

> "Nothing in this Agreement is intended to or shall be deemed to create an ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ PAMF ¶ 77 (emphasis added)

Similarly, the Agreement ██████████████████████████████████████

████████████████████████████████████████████████████████████ ." PAMF ¶ 78.

Further, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████." PAMF ¶ 79. Likewise, Kobalt is

---

[1] Under New York law, the practice of law includes giving legal advice and preparing legal instruments, and it is prohibited for individuals who are not licensed attorneys to engage in these activities. *In re McDonald*, 318 B.R. 37, 47 (2004). Therefore, TuneSat cannot lawfully provide legal advice to Kobalt with respect to its intellectual property, the pursuit of legal claims, or prepare legal documents such as settlement agreements.

██████████████████████████████████████

PAMF ¶ 80.

      TuneSat's services under the agreement are to detect uses of Plaintiffs' music. PAMF ¶ 81. In conjunction with its attorneys, Kobalt then decides whether it will pursue claims based on the uses detected by TuneSat. PAMF ¶ 82. ████████████████████████████ ████████████████████████████████████ ██████ PAMF ¶ 83. ████████████████████████ PAMF ¶ 84.

**II.    Kobalt's relationship with Kuhn**

████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████ PAMF ¶ 85.

██████████████████████████████████████ ████████████. PAMF ¶ 86. The Kuhn Agreement ████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████

████████████████ PAMF ¶ 87. TuneSat's role is limited to investigating and detecting matches of Kobalt's copyrighted works in internet content and providing Kuhn with those detections. PAMF ¶ 88. Then, Kuhn has the authority and duty to act on the detection information. PAMF ¶ 89. Kuhn analyzes whether the potentially infringing detections provided by TuneSat were properly licensed and whether any other defenses to infringement existed for each detection. PAMF ¶ 90. For those detections deemed infringements, Kuhn would begin the process of seeking recovery for the infringing activity. PAMF ¶ 91. Settlement negotiations and agreements involving Kobalt are the purview of Kobalt and its attorneys, not TuneSat. PAMF ¶ 92. Likewise, TuneSat has no

control over the law firm that Kobalt uses to pursue infringement claims. PAMF ¶ 93.

### III. Detection of potentially infringing uses by TuneSat leads to discovery of the Infringing Uses by Kuhn.

After TuneSat completed its quality control review on the uses of Plaintiffs' work it had detected, it made these detections, and certain related data, accessible to Kuhn through TuneSat's case management system. PAMF ¶ 95. Kuhn then performed its infringement review. When Kuhn's review found no licenses, fair use, or other applicable copyright defense, Kuhn began notifying Defendant of the potentially infringing uses. PAMF ¶ 96. After an initial confirmation from Kobalt that Defendant did not have licenses with Plaintiffs, ████████████████ ████████████████████████████████████████████ PAMF ¶ 97.

Kuhn accessed the first Infringing Uses at issue in this case through the TuneSat case management system on July 19, 2021. PAMF ¶ 98. That same day, Kuhn prepared a letter that identified 42 infringing uses of the Plaintiffs' music in Defendant's social media content. PAMF ¶ 99. Of those 42 uses identified in the letter, only 10 are at issue in this case. PAMF ¶ 100. The remaining Infringing Uses in this case were detected by TuneSat and delivered to Kuhn after July 19, 2021. PAMF ¶ 101. Plaintiffs filed this litigation on July 19, 2024, three years after the initial discovery of the Infringing Uses by Kuhn. PAMF ¶ 102. Plaintiffs excluded all other infringing detections that they and Kuhn were aware of prior to July 19, 2021. PAMF ¶ 103.

## ARGUMENT

### I. Standard of Review

On a motion for summary judgment, the moving party bears the initial burden to show that there is "no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). This requires the moving party to establish beyond controversy every essential element of its claim or defense. Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc*., 182 F.3d 157, 160 (2d Cir. 1999). The

court must view all evidence in the light most favorable to the non-moving party and resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Nieblas-Love v. New York City Housing Authority*, 165 F.Supp.3d 51, 65 (2016).

## II.    Plaintiffs' cause of action for direct copyright infringement is timely

Under 17 U.S.C. § 507(b), the statute of limitations for a copyright infringement claim is three years after the claim accrues. See *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014). A copyright infringement claim "accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised." *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996). This is known as the "discovery rule." *Psihoyos*, 748 F.3d at 124; *Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 (2d Cir. 2020).

Plaintiffs filed this action on July 19, 2024. Dkt. 4. Thus, all infringements which accrued on or after July 19, 2021 are timely. Plaintiffs (and their agent, Kuhn) were unaware of any Infringing Uses until July 19, 2021. PAMF ¶¶ 48, 98, 101. Given that the Plaintiffs' earliest discovery of the Infringing Use occurred when Kuhn accessed these uses through TuneSat's case management portal on July 19, 2021, Plaintiffs' infringement claims are timely.

Defendant does not contest this fact for eight of the alleged Infringing Uses. Dkt. 62 ("Def. Mtn.") pg. 15. However, for 28 Infringing Uses, Defendant argues Plaintiffs' claims accrued before July 19, 2021. For 16 Infringing Uses, Defendant contends TuneSat had knowledge of the Infringing Uses before July 19, 2021, and that this knowledge must be imputed to Kobalt. For an additional 12 Infringing Uses, Defendant contends TuneSat "should have known" of the Infringing Uses before July 19, 2021. Defendant's arguments fail.

First, Defendant misinterprets the relationship between Kobalt and TuneSat. As explained below, TuneSat is not Kobalt's agent and TuneSat's knowledge cannot be imputed to Kobalt.

Second, Defendant makes unfounded and inaccurate claims about TuneSat's technology to argue (without evidence) that it could have discovered the detections relating to the Infringing Uses earlier than July 19, 2021. Defendant implies TuneSat's technology can detect all potential

7

infringements for all its clients nearly instantaneously. This argument conveniently ignores the realities of TuneSat's technology. While advanced and powerful, this technology is not error-proof. Thus, TuneSat subjects its detections to a manual, human-led quality control process. This takes time. Moreover, TuneSat's access to Kobalt's "acoustic fingerprints" and Defendant's content is ever expanding. Thus, TuneSat needs to re-analyze the videos it has downloaded for new clients and for existing clients when new information or data is obtained. Given the enormous volume of video data and client data TuneSat analyzes, Defendant's contention that all infringements will be instantly discovered is without factual support.

### A.  TuneSat is not Plaintiffs' agent

"Establishment of [an agency] relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking." *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citations omitted). "The question of whether an agency relationship exists is a mixed question of law and fact." *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Services*, 388 F.Supp.2d 292, 301 (S.D.N.Y. 2005). "Only if the 'material facts from which [agency] is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case,' may agency be decided by the court as a matter of law." *In re JVJ Pharm., Inc.*, 630 B.R. 388, 403 (S.D.N.Y. 2021) ("*JVJ*"), quoting *Lumbermens Mut. Cas. Co*, 388 F.Supp.2s at 301. If the language of the contract is ambiguous, the parties' conduct will determine the existence of an agency relationship, which is a fact for the jury to determine. *Id.* at 404. While issues of agency typically require determination by a finder of fact, no reasonable factfinder could conclude that TuneSat was Plaintiffs' agent.

Neither Plaintiffs nor TuneSat consented to enter an agency relationship with the other, either through their agreement, or through their conduct. ██████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

a. **Plaintiffs' did not consent to TuneSat acting as their agent.**

"Agency reflects mutual consent: the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent." *Elbit Systems, Ltd. v. Credit Suisse Group*, 917 F.Supp.2d 217, 225 (S.D.N.Y.2013) (quotation marks omitted). An agent can have actual or apparent authority. *See Precedo Cap. Group Inc. v. Twitter Inc.*, 33 F.Supp.3d 245, 253-54 (S.D.N.Y. 2014).

A principal can manifest consent for an agent to act on its behalf either by expressly or implicitly granting the agent actual authority. *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 435 (S.D.N.Y. 2010) (quotation marks omitted); *accord Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) ("Actual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.1997))). That said, one does not become an "agent" under New York law simply because that term is used in the title of a contract. *In re Shulman Transp. Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) (affirming district court's refusal to find agency relationship despite "agency" contract).



PAMF ¶ 104.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ PAMF ¶ 105.

Here, Kobalt never granted TuneSat permission to act. PAMF ¶¶ 62-64, 83-84. Instead, Kobalt pursued its claims through Kuhn. PAMF ¶¶ 85, 97. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████ PAMF ¶¶ 65-70.

Defendant's analysis ignores the plain language of the contract.

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████[1]████████████████████ PAMF ¶ 106. ████████

████████████████████████████████████ PAMF ¶ 107. ████████

█████████████████████████████████████████████████████

██████████████████ PAMF ¶ 108. █████████████████████

██████████████████████████████████████████████.

PAMF ¶ 109.

████████████████████████████████████████

████████████████████████████████████████████████████

██████████ PAMF ¶¶ 48, 98, 101. █████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

---

█████████████████████████ . PAMF ¶¶ 48, 98, 101. ███████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Both under the contract and through

the parties' conduct and practice, there is no time when Kobalt conferred TuneSat with agency

for the Infringing Uses, and even assuming, *arguendo,* it had, that agency could not have been

conferred until after July 19, 2021.

Defendant also fails to distinguish between TuneSat and Kuhn. Def. Mtn. pg. 10-11.

Defendant relies on the fact that TuneSat and Kobalt employed Kuhn to render legal services in

connection with this detection process as somehow evidencing an agency relationship between

TuneSat and Kobalt. ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ Def. Mtn. pg. 11. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ . PAMF ¶ 76. ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

This distinction is critical because each entity's knowledge of the Infringing Uses

occurred at different times. Kuhn's knowledge of the Infringing Uses began on July 19, 2021

when it viewed those detections in their TuneSat case management system. PAMF ¶¶ 48, 98,

101. As Kobalt's attorney, Kuhn has a fiduciary relationship with Kobalt, and as a result, Kuhn's

knowledge is attributable to Kobalt. But, TuneSat does not (and did not at the relevant times)

have a fiduciary or attorney relationship with Kobalt.

█████████████████████████████████████████████████

█████████████ PAMF ¶ 110. Defendant asserts that this is not dispositive as to the existence

of such a relationship. Def. Mtn. pg. 10. Certainly, courts note that "labels are not dispositive,

11

and the facts and circumstances of the parties' relationship are what determine whether an agent-principal relationship existed." *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F.Supp.2d 94, 103 (S.D.N.Y. 2013). That said, the law is also clear that "[p]arties may by contract disclaim a principal-agent relationship." *Supreme Showroom, Inc. v. Branded Apparel Group LLC*, 2018 WL 3148357 at *9 (S.D.N.Y. 2018); *see also Sellify Inc. v. Amazon.com, Inc.*, 2010 WL 4455830 at 3 (S.D.N.Y. 2010) ("The Operating Agreement specifically disclaimed any agency relationship between Amazon and Cutting Edge."). Where a disclaimer is "express and unambiguous" it will be operative. *Supreme Showroom*, 2018 WL 3148357 at *9. Indeed, ██ ████████████████████████████████████████████████████████████████ ██████████████ — *JVJ,* 630 B.R. at 404 — and supports Plaintiffs' position. In *JVJ*, the court determined the contract disclaimer at issue was not sufficiently "express and unambiguous" and recognized that if it had been otherwise, the disclaimer would have been operative. *Id.*

The *JVJ* decision relied on *Supreme Showroom* 2018 WL 3148357 at *9 to determine that the language at issue was not specific enough. *JVJ* at 405. In *Supreme Showroom*, the court set forth the following instances in which contractual language would be sufficient to disclaim an agency relationship:

> (1)      "Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party;"
>
> (2)      "None of the [relevant parties] is acting as a fiduciary or financial investment advisor for the Investor;"
>
> (3)       "CFSC is not acting as fiduciary for the purchaser;"
>
> (4)       "Each party represents to the other party [that] the other party is not acting as a fiduciary or adviser to it in respect of this Transaction"

*Supreme Showroom* 2018 WL 3148357 at *9 (collecting cases) (cleaned up).

Any one of the disclaimers in the above language is sufficient under *Supreme Showroom* to make the clause "express and unambiguous." 2018 WL 3148357, at *9. ████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████

████         PAMF ¶ 111. Later, it states, ██████████████████████████████

████   PAMF ¶ 112. TuneSat and Kobalt did not intend to create an agency relationship.

Defendant attempts to overcome the clear disclaimer of an agency relationship by claiming the agreement "erects the essential structure of an agency relationship." Def. Mtn. pg. 11, citing *JVJ* at 404, citing *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015). Yet, in doing so, Defendant cherry-picks language from the contract without considering the full structure of the agreement.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████   . PAMF ¶¶ 49, 53, 54, 62-70, 83. Kobalt never granted that additional authority pursuant to the agreement. PAMF ¶ 64, 84. Kobalt likewise never granted that authority in practice. PAMF ¶¶ 62-70, 84. Defendant ignores the fact that TuneSat never took steps to ██████████████████████████   never contacted an infringer on behalf of Kobalt, never negotiated on Kobalt's behalf, and never entered into an agreement regarding infringements of Plaintiffs' music. PAMF ¶¶ 66-70. Thus, "the facts and circumstances of the parties' relationship" belie an agency relationship.[3]

   **b.     TuneSat did not consent to act as Plaintiffs' agent.**

Even if Plaintiffs did consent to TuneSat acting on its behalf as an agent, TuneSat never accepted this responsibility or consented to act as Plaintiffs' agent. An agency relationship requires mutual consent. *See, Elbit Systems, Ltd.*, 917 F.Supp.2d at 225. Therefore, an agent's lack of consent to be bound can be dispositive of the existence of an agency relationship.

Whether judged by the nature of TuneSat's conduct, or the structure and language of the agreement, TuneSat's sole responsibility was to detect potential uses of Plaintiffs' music. PAMF ¶¶ 49, 54, 62-70. As explained above, ██████████████████████████████

---

[3] *See, Northern Shipping,* 921 F.Supp.2d at 103.

████████████████████████████████████████████████. The Court should refrain from redefining the parties' understanding of their duties under the contract.[4] TuneSat's actions bear out the fact that there was no agency relationship: TuneSat never sought to exercise any authority on behalf of Kobalt. TuneSat only had authority to detect uses of Plaintiffs' music.

TuneSat's lack of consent to act on Kobalt's behalf is affirmed by its decision to hire Kuhn. Upon execution of the Kuhn Agreement, █████████████████████████████████████ ████████████████████████████████████████ PAMF ¶ 113. By employing Kuhn to undertake these responsibilities, TuneSat demonstrated it did not consent to being Kobalt's agent.

### c.    Kobalt did not control the services TuneSat rendered.

"'[T]here is no agency relationship where the alleged principal has no right of control over the alleged agent.'" *Star Energy Corp. v. RSM Top–Audit,* No. 08 Civ. 00329, 2008 WL 5110919, at *2 (S.D.N.Y. Nov. 26, 2008), quoting *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F.Supp. 1475, 1481 n. 2 (S.D.N.Y.1987). In New York, the sufficiency of control is a question of fact. *In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 618 (Bankr. S.D.N.Y. 2002). While control is necessary in an agency relationship, it is not sufficient, as "[t]he agent's power to alter legal relations between the principal and third persons is also an essential element of the agency relationship." *Mouwad Nat. Co. v. Lazare Kaplan Intern, Inc*., 476 F.Supp.2d 414, 423 (S.D.N.Y. 2007).

Defendant asserts that "[Kobalt] maintains control over how TuneSat acts and how [Kuhn] acts on TuneSat and [Kobalt's] behalf." Def. Mtn. pg. 11. ████████████████████████ ████████████████████████████████████████████████████████████████

---

[4] Courts will typically look at the contract between the parties to identify the relationship and ordinarily not "transport [the parties] to the higher realm of relationship and fashion the stricter duty for them." *Lavastone Cap. LLC v. Coventry First LLC*, No. 14-CV-7139, 2015 WL 1939711, at *10 (S.D.N.Y. Apr. 22, 2015), quoting *EBC I, Inc. v. Goldman Sachs & Co .,* 5 N.Y.3d 11, 19–20 (2005). Where the parties to a contract engaged in an arm's length commercial transaction, a fiduciary relationship will not be found "absent extraordinary circumstances." *Ritchie Capital Mgmt., LLC v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *6 (S.D.N.Y. July 17, 2007), quoting *Mid–Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002).

█████████████████████████████████████████████████ *Id.* █████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████ .

In almost any contract, rights are explicitly or implicitly withheld. ███████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Thus, ████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████ . Neither party agreed nor sought for TuneSat to act on Kobalt's behalf. Again,

TuneSat's responsibility was to locate detections of Kobalt's music.

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████ Here, TuneSat only performed the first set of services.

Therefore, TuneSat lacked the power to alter legal relations between Kobalt and third-persons,

an "essential element" of an agency relationship. *Mouwad Nat. Co.*, 476 F.Supp.2d at 423.

███████████████████████████████████████████████████████████████

████████ ███████████████████████████████████████████████ PAMF ¶¶ 51, 61.

███████████████████████████████████████████████████████████

█████████████████████████ PAMF ¶ 114. ████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████ PAMF ¶ 115.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ . Kobalt did not

dictate or control how TuneSat performed that service, and TuneSat maintained control over its methods. Neither party manifested an intent for TuneSat to become an agent or perform tasks beyond that limited role. Thus, no agency relationship was formed.

### B. TuneSat's knowledge cannot be imputed upon Plaintiffs.

An agent's knowledge can only be imputed on a principal for a discovery made after it is engaged on the principal's behalf, and only under the scope of its services as the principal's agent. *See Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 141 (S.D.N.Y. 2012) (holding that a firm's knowledge of the misconduct prior to its engagement was not imputed to the principal.) (citing *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994)).

It is beyond dispute that "an agent's knowledge is properly imputed to his or her principal for statute of limitations purposes only where the 'agent is employed to represent [the] principal with respect to a given matter and acquires knowledge material to that representation.'" *Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*, 399 F.Supp.3d 120, 138 (S.D.N.Y. 2019), quoting *Veal*, 23 F.3d at 725. The rule is almost always applied to an attorney-client relationship, but "[t]o the extent it applies in situations where the agency relationship is something other than that of a lawyer-client, its application is narrower." *Id.* In this narrower application, the *Jose Luis Pelaez* Court found it relevant that "the agents (1) had been 'formally appointed' by the plaintiffs to receive all communications from the defendant concerning the actions which formed the bases of plaintiffs' claims; (2) had 'threaten[ed the defendant] with litigation'; and (3) had attempted to effect a global settlement on behalf of plaintiffs." *Id.*, citing *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 381 F. Supp. 2d 334, 339 (S.D.N.Y. 2005).

The Court in *Jose Luis Pelaez* determined that the agency relationship at issue, in which the principal gave the agent the right to sublicense its work, did not include the prosecution of infringement claims, and was accordingly not broad enough to impute the agent's discovery of alleged infringement to the principal. *Id.*

In sum, agency principles applicable to attorneys in the discovery and prosecution of claims are not directly applicable to non-attorneys like TuneSat. Attorneys are the best-situated

16

agents to receive, understand, and communicate material information related to their clients' legal claims. Additionally, attorneys have fiduciary duties that require them to diligently and competently investigate material information and communicate this information to their clients. Other relationships, including agency relationships such as that in *Jose Luis Pelaez*, often arise with far less expectations that the agent will perform in the same way on its principal's behalf. *Id.* Imputing knowledge on principals from agents who do not specifically agree to undertake such actions is unfair both to the principal and the agent. Among other things, this would expose agents to potential liability that they would not know about at the time of creating the relationship. TuneSat is not Kobalt's agent, and so any discovery or purported discovery TuneSat made cannot be imputed to Kobalt. Even assuming, *arguendo*, TuneSat is an agent, since the TuneSat-Kobalt Agreement imbues TuneSat with even less legal authority than the contract at issue in *Jose Luis Pelaez*, its knowledge should still not be imputed on Kobalt.

**C. No material time passed between when Kuhn learned of the Infringing Uses and made a legal determination of infringement.**

Before reaching the question of when TuneSat knew or should have known about Defendant's infringements, Defendant argues that, as a general matter, Plaintiffs cannot claim "knowledge was not imputed [during the period of time] while Kuhn made a legal determination of infringement." Def. Mtn. pg. 12. Defendant rests this argument on caselaw that provides that a party is deemed to have sufficient knowledge to trigger the running of the statute of limitations when the party knows "'enough of the critical facts of injury and causation to protect himself by seeking legal advice.'" *Id.*, quoting *Parisienne v. Scripps Media, Inc*., No. 19 CIV. 8612 (ER), 2021 WL 3668084, at *4 (S.D.N.Y. Aug. 17, 2021). But Plaintiffs have not sought to exclude any period of time during which Kuhn "made a legal determination of infringement." Def. Mtn. pg. 12.

Kuhn discovered the Infringing Uses at earliest on July 19, 2021, the same day they accessed the detections in TuneSat's case management system. PAMF ¶¶ 48, 98, 101. Kuhn

made a legal determination of infringement and sent a cease and desist letter to Defendant concerning all known detections on that date. PAMF ¶ 99. This is the discovery date for statute of limitations purposes. While Defendant acknowledges Khun's access date, it attempts to use – instead of July 19, 2021—the date TuneSat's software made a detection or "should have" made a detection as the operable date. Again, Defendant fails to make a crucial distinction between Kuhn and TuneSat and their distinct duties to Kobalt with respect to this litigation.

**D. Even if the Court concludes that TuneSat was Kobalt's agent, when TuneSat discovered or should have discovered the infringements is an issue of fact.**

Even assuming TuneSat is Kobalt's agent - and it is not- there exists a genuine issue of fact as to when TuneSat discovered or should have discovered the infringements at issue here. Defendant includes two charts in its moving papers, each with dates concerning TuneSat's detection of Plaintiffs' music. Def. Mtn. pg. 13-16.



Defendant's argument fails to account for, or even acknowledge, the realities of TuneSat's technology. As an initial matter, ████████████████████████████ ████████████████████████ In the period from January 1, 2021 through July 18, 2021, there were nearly ████ detections ████████████████████████████ for all its clients. PAMF ¶ 116. There were more than ████ detections of Kobalt's music ████████████. PAMF ¶ 117. On average during the first part of 2021, TuneSat ████████████ ████████████████████████ PAMF ¶ 118.

For purposes of determining the exact date on which TuneSat discovered the use, none of the dates Defendant provides are particularly relevant, because they always precede TuneSat's quality control process. To simply take the date on which ████████████████████ ████████████████████████ the exact date on which it is discovered

completely undermines the point of the discovery rule and encourages a lack of diligence. As to the discovery rule, a copyright holder has no duty to scour the internet to find potential infringements,[5] because it would impose an unfair burden on a rights holder. TuneSat's software is a tool by which diligent copyright holders can narrow the field of potential infringements in which a holder has to scour, but it is still a large and imperfect field. To hold that discovery occurs instantaneously would, in effect, discourage rightsholders from protecting their copyrights by using services like TuneSat's, and, in turn, encourage the theft of intellectual property.

Since it is impossible to rely on the ▮▮▮▮▮▮▮ as being the exact date of discovery, a real question of fact exists as to when TuneSat discovered or should have discovered the infringements. Defendant does not allege TuneSat was not diligent in its efforts to detect the infringements. Indeed, it alleges quite the opposite, as it recognizes "TuneSat then 'go[es] through a series of quality control to ensure each [] detected use is accurate and that the client's ownership interest is accurate,' and once that process is complete, 'that information is then passed on to the client's counsel and/or the client.'" Def. Mtn. pg. 3. Defendant makes no allegation about the length of time this process should take. Instead, it seems to suggest that TuneSat should simply forego any quality control process, and dump the raw information on its clients, making it a far less useful service, and creating a situation in which unchecked and potentially frivolous claims would be advanced.

### a.    Sixteen uses were not "found" prior to July 19, 2021

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Their focus on this date is misguided because, as mentioned, even the latest of the three dates provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, these Infringing Uses can be divided into three categories that explain the discrepancies in the dates provided: ▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] *Minden Pictures, Inc. v. Conversation Prints, LLC*, No. 20-12542, 2022 WL 4667967, at *3 (E.D. Mich. Sept. 30, 2022)("Courts have held that a copyright holders have no duty to scour the internet if anyone is using [their copyrighted work] without consent")



However,

*See, In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) ("A principal is not charged with acts or knowledge of an agent when the agent acts outside the scope of the agent's employment").

PAMF ¶ 119.

PAMF ¶ 120.

The second category of Infringing Uses in Defendant's first chart is related to the uses on www.nba.com, when TuneSat became aware of this particular channel of content for Defendant. PAMF ¶ 121. The third category is Infringing Uses where

PAMF ¶ 122.

As stated, none of these dates indicate the true date of TuneSat's knowledge, which even under the most Defendant-favorable interpretation of the facts,

generally at a much later time than any of the dates proffered by Defendant. Even if the Court finds, as a matter of law, that TuneSat is an agent, and that its knowledge can be imputed to Kobalt, then there must be a determination about when TuneSat discovered or reasonably should have discovered these uses. This, however, is a question of fact for a jury to determine. There is a legitimate question of fact as to when TuneSat began its quality control check as to each Infringing Use, how long the quality control check

lasted, TuneSat's diligence in orchestrating the quality control check, the number of infringements TuneSat sorted through, and other factors more relevant to the date TuneSat discovered or should have discovered the detection ███████████████ Since these questions cannot be answered on summary judgment, Defendant's most colorable statute of limitations claims must, at minimum, be sent to a jury if TuneSat is truly Kobalt's agent.[6]

The operative discovery date is July 19, 2021. Kuhn's earliest discovery date occurred when it first accessed the Infringing Uses in the TuneSat case management portal. PAMF ¶¶ 48, 98, 101. That date is July 19, 2021 and is within the 3-year statute of limitations. For Infringing Uses discovered after July 19, 2021, the information in the possession of Kuhn shows that data relating to those uses was accessed after July 19, 2021. PAMF ¶ 123. TuneSat does not possess or maintain this information. PAMF ¶ 123. █████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
███████████ PAMF ¶ 124.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[6] To reiterate, TuneSat is not Kobalt's agent, TuneSat's knowledge cannot be imputed upon Kobalt, and Kobalt's discovery of the Infringing Uses began when Kuhn became aware of the Infringing Uses through TuneSat's case management portal.



**a. Defendant fails to meet its burden that Plaintiffs should have known about 12 Infringing Uses before July 19, 2021.**

However,

However, Defendant points to no legitimate reason why the detections should have been

discovered before July 19, 2021. It points out that "TuneSat █████████████████

███████ [Kobalt's] Audio[. T]herefore TuneSat should have discovered through diligence the

Accused Works already in its database." Def. Mtn. pg. 16. This does not follow logically, as

Defendant recognizes that TuneSat *was* diligent by ████████████████████████. The fact

that it did not detect the uses until later indicates it could not have detected them earlier.

Defendant claims, without evidence, that once TuneSat possesses a piece of content that

contains one of its client's works it is incumbent upon them that they should immediately locate

the infringement. This position ignores the evidence on how TuneSat made the detections.

Indeed, eight of the twelve uses ████████████████████████████████

██████████████████████████████ These detections involve videos

████████████████ ¶ 125. In the fall of 2021, TuneSat discovered that its automated

acoustic fingerprinting system ████████████████████████████████

PAMF ¶ 126. Upon investigation, TuneSat determined that █████████████████████

████████████████████████████████████████. PAMF

¶ 127.

To address this █████████ TuneSat instituted a protocol requiring ████████████

████████████████████. PAMF ¶ 128. ██████████████████████████

████████████████████████████████ ¶ 129. Furthermore, when this protocol

was initiated, TuneSat faced ████████████████████████████████

████████████████████ ¶ 130. Consequently, ████████████████████

████████████████████████████████████████████

████████████████████ PAMF ¶ 131. Defendant fails to

address this reality, and does not meet its burden to demonstrate that TuneSat should have

discovered these detections earlier when it was forced to review these detections manually.

Further, the remaining three Infringing Uses were detected in 2024, because TuneSat did

not receive the fingerprints for the corresponding songs until then. It was impossible for TuneSat

to find these uses before July 19, 2021 with the exercise of due diligence, because it had no

reason to suspect the uses were infringing on any of Kobalt's music until it received the fingerprint. As stated, TuneSat's software cannot detect a use without both the potentially infringing content and the client's "acoustic fingerprint." PAMF ¶¶ 55-56, 58-60. For these three uses, TuneSat did not possess the client's acoustic fingerprint and necessarily could not have detected the use any earlier.

Defendant fails to meet its burden that TuneSat could find these detections earlier. Its contention is that by simply possessing the potentially infringing content, TuneSat's technology can immediately detect the use, but it does not account for the practical realities of how TuneSat operates. Further, it is hard to fathom what a more diligent plaintiff should have done to discover the Infringing Uses sooner to be more diligent than engage a company like TuneSat, which has the capability to search ███████████████████████████████ Although imperfect, TuneSat's technology cannot be found to be delinquent in investigating uses of copyright material, compared to any unidentified alternative. As such, the uncontested facts demonstrate that these 12 Infringing Uses were discovered within the statute and Defendant fails to show that they would have been discovered sooner by a more diligent plaintiff. Thus, Defendant's motion as to these 12 Infringing Uses must be denied.

## CONCLUSION

Defendant's motion should be denied. No reasonable factfinder could conclude TuneSat or Kobalt consented to an agency agreement, or that Kobalt possessed the requisite control to form an agency agreement. Further, even if TuneSat were deemed an agent, Defendant fails to establish as a matter of law that TuneSat's knowledge can be imputed upon Kobalt. Finally, Defendant fails to establish when Plaintiffs discovered the Infringing Uses or why they should have discovered any Infringing Uses prior to July 19, 2021. The clear discovery date is July 19, 2021, when Kuhn, Kobalt's agent, had knowledge of the Infringing Uses. Defendant's motion fails.

DATED: February 28, 2025

By    */s/ Douglas Johnson*_____
Douglas Johnson
**JOHNSON & JOHNSON LLP**
Douglas L. Johnson (Admitted Pro Hac Vice)
Frank R. Trechsel (Admitted Pro Hac Vice)
439 N. Canon Dr. Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Email: djohnson@jjllplaw.com
 ftrechsel@jjllplaw.com

## <u>CERTIFICATE OF COMPLAINCE</u>

I hereby certify that Plaintiffs' Memorandum Of Points And Authorities Opposing

Defendant's Motion For Summary Judgment contains 8,694 words in compliance with Local

Rule 7.1.


By     <u>*/s/* Frank R. Trechsel</u>
       Frank R. Trechsel

**JOHNSON & JOHNSON LLP**
Douglas L. Johnson (Admitted Pro Hac Vice)
Frank R. Trechsel (Admitted Pro Hac Vice)
439 N. Canon Dr. Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
Email: djohnson@jjllplaw.com
  ftrechsel@jjllplaw.com