P3EDArtO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARTIST PUBLISHING GROUP, LLC,
ET AL.,

                 Plaintiffs,

         v.                  24 CV 05461

ORLANDO MAGIC, LTD., ET AL.,

                 Defendants.        Oral Argument
------------------------------x

                               New York, N.Y.
                               March 14, 2025
                               11:00 a.m.

Before:

                  HON. JED S. RAKOFF,

                               District Judge

                    APPEARANCES

JOHNSON & JOHNSON, LLP
     Attorney for Plaintiffs
BY:  FRANK TRECHSEL

BARNES & THORNBURG, LLP
     Attorneys for Defendants
BY:  BENJAMIN PENDROFF
     WILLIAM CRAVER

P3EDArtO

1          (Case called)

2          THE DEPUTY CLERK:  Parties please identify themselves

3   for the record.

4          MR. TRECHSEL:  Good morning, your Honor.  Frank

5   Trechsel on behalf of plaintiffs.

6          MR. PENDROFF:  Good morning, your Honor.  Ben Pendroff

7   and Bill Craver of Barnes & Thornburg on behalf of Orlando

8   Magic.

9          THE COURT:  Good morning.

10         All right.  We are here for cross-motions on summary

11  judgment.  So, I want to first hear on the defendant's motions,

12  and then we'll separately hear on the plaintiff's motion.

13         Let's begin with defense counsel.

14         MR. PENDROFF:  Thank you, your Honor.

15         Twenty-eight of the accused uses in this case are time

16  barred by the Copyright Act statute of limitations, and that's

17  because plaintiffs either directly or through their agents knew

18  or should have known, with the exercise of reasonable

19  diligence, the facts and circumstances underlying their claims.

20         THE COURT:  So if I understand your argument, it's

21  premised on two assumptions.  One is a TuneSat was an agent of

22  the plaintiffs; and, second, that even as to some of the songs

23  that were not found by TuneSat initially but they were on their

24  collection, if you will, and so, with due diligence, they would

25  have discovered them if they had exercised greater due

P3EDArtO

1    diligence.

2              Do I have that right?

3              MR. PENDROFF:  So, it's two-fold, your Honor.  It can

4    be because TuneSat was their agent.

5              THE COURT:  TuneSat.  Yes.

6              MR. PENDROFF:  Yes, because TuneSat is their agent,

7    and their knowledge is imputed to plaintiffs, or if the Court

8    were not inclined to find that TuneSat is plaintiff's agent,

9    although he would think that no reasonable jury would find they

10    weren't their agent, we know that plaintiffs were on notice of

11    an alleged copyright infringement as far back as the summer of

12    2020.  And certainly by January '21 -- sorry, January 19, 2021,

13    Kuhn Law Group, who is plaintiff's agent, as their lawyer,

14    notifies plaintiffs of alleged infringement by the Orlando

15    Magic.

16              So, at the absolute latest, by January 19, 2021, both

17    Kuhn and plaintiffs knew of alleged infringement, and based on

18    the TuneSat data, we know a diligent search would have found at

19    least 16, if not 28 of the accused uses.

20              THE COURT:  So let's take, first, the agency question,

21    and then we'll get to the due diligence question.  So the

22    contract says expressly that TuneSat is not the agent of

23    Kobalt, the plaintiff's representative in this regard.  Now,

24    that's not dispositive, but why doesn't that at least create a

25    jury issue?

P3EDArtO

1          MR. PENDROFF:  So, yes, that's in there.  These

2     entities, Kuhn Law, TuneSat, and plaintiffs, have all been

3     working together for a long time; and TuneSat's former chief

4     legal officer is Jessie Kuhn, who founded the Kuhn Law Group,

5     so they've had that working relationship for a long time.  And,

6     admittedly, I think Ms. Kuhn drafted documents with some

7     foresight to try to avoid what we're doing here, and putting

8     that agency disclaimer.  The problem is, even as the Court

9     noted, even an express disclaimer is not dispositive.

10          And as Judge Chin found in the *Samber v. Ainesh* case,

11     it would still be proper to find agency on summary judgment

12     even in the face of an expressed disclaimer where the rest of

13     the facts and circumstances show that an agency relationship

14     exists.  So when you look at the totality of the agreement

15     itself, it plainly shows an agency relationship, and then when

16     you look at the combination of the TuneSat agreement with the

17     Kuhn Law agreement and the fact that Kuhn Law is jointly

18     engaged by both TuneSat and plaintiffs, and that TuneSat was

19     working since July 2020 to identify and monetize the exact uses

20     that bring us here today, we can see that they were all working

21     together.  And that's buttressed by the fact that TuneSat

22     actually has an economic stake in this case.  They get a

23     percentage of any award plaintiffs would get.

24          So, when we look at the totality, that disclaimer

25     doesn't really mean anything.

P3EDArtO

| | |
|---|---|
| 1 | THE COURT:  Well, in looking through your papers -- |
| 2 | and thank you for the excellent briefing I received from both |
| 3 | sides -- I didn't find any occasion in which TuneSat expressly |
| 4 | purported to act on Kobalt's behalf.  One of the agency |
| 5 | requirements -- I'm looking at the Second Circuit's decision in |
| 6 | *Johnson v. Priceline*, and, "the three elements necessary to an |
| 7 | agency relationship are: |
| 8 | One, a manifestation by the principal that the agent |
| 9 | will act for him; |
| 10 | Two, acceptance by the agent of the undertaking; |
| 11 | And, three, an understanding between the parties that |
| 12 | the principal will be in control of the undertaking." |
| 13 | I didn't see much on that third element.  I saw things |
| 14 | on the first two, but not on the third. |
| 15 | What about that? |
| 16 | MR. PENDROFF:  So the plaintiffs, they did control |
| 17 | what TuneSat looked for.  If we look at the agreement, TuneSat |
| 18 | was not permitted to look for anything that plaintiffs didn't |
| 19 | tell them to look for.  So, TuneSat was granted a license in |
| 20 | the agreement to look for the accused uses.  If they weren't |
| 21 | granted that license and given permission and direction by |
| 22 | Kobalt, they couldn't even look for those uses. |
| 23 | We also have testimony from -- in the following |
| 24 | declaration from Kobalt's representative, Ron Christensen, that |
| 25 | said Kobalt didn't direct TuneSat to look at other potential |

P3EDArtO

1    infringers other than what TuneSat brought to them.  The

2    same -- Kobalt said, this is what you brought to us; this is

3    what we want you to go and search for.

4          Also, in the agreement, Kobalt plainly gave TuneSat

5    the ability to try to monetize the infringements after they

6    identify them, and that's because once they identified these

7    targeted uses, that gave TuneSat the ability to go out and try

8    to settle these cases and try to monetize the targeted uses on

9    behalf of plaintiffs.

10         Now, plaintiffs say there were no targeted uses,

11   therefore, that obligation or right never actually triggered,

12   but that wouldn't really make any sense if there were no

13   targeted uses.  A, we're here, so we're obviously a target that

14   came up, but we know that Kobalt told TuneSat which companies

15   to go after, and the targeted uses trigger other things in the

16   agreement that make clear that targeted uses were there.

17         For instance, without targeted uses, TuneSat wouldn't

18   have the license to go search for the infringement.  So because

19   we did that, we know there were targeted uses, thus giving

20   TuneSat the rights given to them in the agreement, which make

21   them an agent under Kobalt's control.

22         THE COURT:  All right.  Let's turn to the due

23   diligence prong of your motion.

24         With respect to the videos that were not located until

25   after the cut-off date, or I guess the better way to put it is

P3EDArtO

1    TuneSat would be not barred by the statute of limitations,

2    other than by virtue of your due diligence argument.  Do I

3    understand, are you saying that independent of agency, the

4    plaintiffs had some duty to find those earlier, or are you just

5    saying the Kuhn Law firm did, or are you just saying TuneSat

6    did?

7         MR. PENDROFF:  No.  I'm saying even independent of

8    agency, because plaintiffs were alerted on January 19, 2021,

9    that the Orlando Magic were allegedly infringing at least some

10   purported copyrights, at that point they were clearly on notice

11   of potential infringement, and they had an obligation to look

12   for all other infringement.  That's why a lot of the --

13        THE COURT:  So, they go out and hire TuneSat to look

14   for them.  What's wrong with that?

15        MR. PENDROFF:  And so, because TuneSat was looking for

16   them, we know how long it would have taken a diligent plaintiff

17   to find the infringement.  The discovery rule, it's an

18   objective standard as to how long it should take to find these

19   things.  And TuneSat showed us that with a diligent search,

20   these accused uses, at least 16 of them were plainly found.

21   The uses were matched to the purported copyrights.

22        THE COURT:  Yes, but, as I understand it, they get a

23   lot of hits, for lack of a better word, but they then have to

24   individually look at them, because some of them are not going

25   to be infringements.  Some of them are just not going to be the

P3EDArtO

1    right song.  There are lots of technical problems.  So you have

2    to do a "quality control" is I think their term.

3          So, what about that?

4          MR. PENDROFF:  So I understand that's part of their

5    argument.  I don't see anything in the case law that says

6    things have to be verified.  It's the fact that once you are on

7    notice and have, in your possession, the facts that would lead

8    to a legal claim, right?

9          MR. PENDROFF:  *Stone v. Williams* says you don't have

10    to know the legal rights.  You just have to know the facts

11    underlying it.  So by July 13, 2021, at least for the 16

12    accused uses, TuneSat had found videos and matched them up to

13    the "acoustic fingerprint."  So whether or not they determined

14    at that point whether there was actual infringement shouldn't

15    really have mattered.  They could you have been sent to Kuhn

16    right away, and those could have been forwarded to Kobalt right

17    away, but for whatever reason they sat on it.  And I don't

18    believe the control --

19          THE COURT:  Well, so, again, what I'm trying to -- the

20    heart of my inquiries are whether there's a jury question here,

21    because we do have of course a firm, fixed trial date of

22    May 19.

23          So I'm the plaintiffs here.  I hire TuneSat to do the

24    search for me.  That seems reasonable.  TuneSat reports back to

25    me there are some hits, in effect, some copyright infringement,

P3EDArtO

```
1    and then I rely on them to do the quality control, or whatever

2    it's called, to make sure that we find out which are for real,

3    and which are not, and why is that not something the jury could

4    find was adequate due diligence?

5           MR. PENDROFF:  So, it's not -- I don't think it's not

6    that there was due diligence.  It's that because of the due

7    diligence -- during the diligence, they should have found the

8    infringement.  The Grecco case, which is up on cert., says you

9    must have been unable to find the infringement within three

10   years preceding filing the complaint.

11          We know Kobalt gave metadata to TuneSat in 2020.  We

12   know, according to TuneSat's representative, it takes seconds

13   to make acoustic fingerprints and then takes just minutes to

14   match to a video.  So if they sent all that data in 2020 and

15   all this is done in just a matter of minutes, there's really no

16   reason it should have taken as long as it did.  And so we think

17   that TuneSat, even in it's diligence, should have found these

18   things earlier.  But certainly, once Kobalt knew about them,

19   they were on notice.  But, again, it should go back to the

20   knowledge TuneSat had as their agent, imputing it to

21   plaintiffs.

22          THE COURT:  Okay.  Let me have you sit down for a

23   moment, and let me hear from your adversary on this motion, and

24   get rebuttal from you on this motion.  Then we'll deal with the

25   other motion.
```

P3EDArtO

1          MR. PENDROFF:  Thank you.

2          MR. TRECHSEL:  Good morning, your Honor.

3          I believe that a lot of your inclination and intuition

4   on this is correct, and I'll start with the agency aspect.  You

5   said that, you know, the disclaimer in the agreement at least

6   creates a jury issue, and I think that that is absolutely

7   correct.  One of the main cases that defendants rely on,

8   *Veleron*, I believe it was called, specifically states that they

9   were unable to rule on the issue of an agent principal

10  arrangement, because -- if not for the fact of a disclaimer,

11  which is some evidence in the opposite direction of finding an

12  agency principal relationship -- that's *Veleron Holding v.*

13  *Morgan Stanley* -- and I think that's exactly what we have here.

14         But not only do we have the disclaimer, but we have

15  conduct that shows that the disclaimer effect was actually the

16  practical reality of the relationship of TuneSat -- again, this

17  is something that I believe you picked up on, is that TuneSat

18  has never acted on behalf of Kobalt with respect to any third

19  party.  That has not occurred.  That didn't occur here.

20  Orlando was not contacted by TuneSat.  TuneSat has not

21  negotiated agreements.  They have not reached out to third

22  parties who have intentionally infringed.  That's all.

23         THE COURT:  No.  But didn't they have that right in

24  the contract, if I have this right, a provision that grants

25  TuneSat or -- "Magic grants TuneSat the exclusive right to

P3EDArtO

1  undertake all reasonable and lawful acts that, in TuneSat's

2  reasonable judgment, may be necessary and proper to retrain

3  and/or monetize any infringement of targeted uses and/or to

4  negotiate and obtain any settlement concerning the targeted

5  uses."

6      Now, the fact that they may not have done that doesn't

7  take away, does it, from the fact that that's the kind of power

8  that typically you give to an agent?

9      MR. TRECHSEL:  Yes, your Honor, but that -- the key

10  point of that provision I think is this targeted uses issue,

11  and from a practical standpoint, and this is described in some

12  of the declarations submitted in support of our opposition, is

13  that the terms -- the term "targeted use," while in the

14  contract itself is not necessarily a term that's used by any of

15  the parties involved in practicality, but what occurs here is

16  there are two defined terms in the agreement, "company list"

17  and "targeted uses," and defendants conflate the two.

18      In fact, in their separate statement, they even

19  specifically provide the definition for "company list," which

20  is "TuneSat shall provide licensor with companies and/or brands

21  that are potentially using licensor's audio without

22  authorization."  The company list, that's how it's defined in

23  the agreement.  In their separate statement they state that

24  exact definition, but then say the "targeted uses," which is

25  incorrect.  And I think it causes confusion, because what

P3EDArtO

```
1   initially occurs is TuneSat discovers some uses of the Kobalt

2   music or plaintiff's music in content online, provides that

3   list, the company list, and then licensor, meaning Kobalt, can

4   authorize TuneSat to pursue those as targeted uses.

5        That part never occurs, because they have engaged

6   TuneSat to undertake responsibilities --

7        THE COURT:  So you're saying that the clause I just

8   read really wasn't utilized, because "targeted uses" is defined

9   in a way --

10       MR. TRECHSEL:  Yes.

11       THE COURT:  I think it's matters TuneSat is permitted

12  to pursue.

13       MR. TRECHSEL:  Right.

14       THE COURT:  They didn't permit them to pursue the

15  stuff under the clause I earlier read.  To that extent, they

16  weren't acting as their agent.

17       MR. TRECHSEL:  That is exactly correct, and that is

18  not to say no one was permitted to pursue them.  It's just that

19  TuneSat was not.  They defer those responsibilities to Kuhn,

20  and that makes a lot of sense for a lot of practical reasons.

21  Defendants sort of intimate that the parties were foreseeing

22  this outcome five years down the road and were trying to

23  prevent the statute of limitations tolling with respect to

24  agency or agreement.  I don't believe that is the case.

25       I believe what the parties were trying to do is
```

P3EDArtO

1   delineate the services that TuneSat would perform for the

2   plaintiff.  And in practicality, they were realizing TuneSat is

3   not a legal service.  They do not have the qualifications to

4   determine whether any of their detections are actually

5   infringing, and that's not -- shouldn't be their role.  And

6   they don't have the qualifications to negotiate a settlement

7   agreement, know the legal impact or effect of a particular

8   settlement agreement.

9          THE COURT:  What about now going to the other prong of

10  the argument?  So your adversary says, okay, even if TuneSat

11  was not your agent, they made you aware at an early date that

12  there were infringements out there, and then it was up to you

13  to exercise due diligence to see what else was out there, and

14  if you didn't turn off the relevant songs and didn't bring a

15  timely action, too bad for you, is their argument.

16         So, what about that?

17         MR. TRECHSEL:  Well, I think defendants mentioned the

18  *Grecco* case that's up on cert. right now, and I think that that

19  case demonstrates and assists plaintiff in this position.  That

20  case stands for the proposition that on inquiry notice, the

21  statute of limitations doesn't begin accruing on inquiry

22  notice.  It accrues on actual notice.

23         In that case, the plaintiff was taking efforts -- it

24  was a sophisticated copyright holder who sort of scoured the

25  internet for potential infringements, and the defendants

P3EDArtO

1   attempted to hold that against them in saying that, well, you

2   knew that there were serial infringers; you should be

3   monitoring them more closely, or you are held to a higher

4   standard.  And the case said, no, that is not how this should

5   operate.  And importantly --

6           THE COURT:  When the Supreme Court granted cert., was

7   it on that issue?

8           MR. TRECHSEL:  I am not sure.  I believe that it's --

9           THE COURT:  Also, if you know -- I should have looked

10  this up beforehand -- has that case been argued yet, or just

11  what stage is it at?

12          MR. TRECHSEL:  No, it has not been argued.  I don't

13  believe that the -- they are still waiting on briefing from the

14  plaintiff, what would have been the plaintiff side, Grecco

15  side.  Only the defendant has presented briefing so far.

16          But another important part of that case, and I think

17  it goes right to the heart of this issue, is that the Court

18  stated this was a plaintiff who was being diligent, was

19  undergoing these efforts.  And when it discovered the

20  potential -- or alleged infringement couldn't have been found

21  earlier, because the diligence was being done, and -- that's

22  when it was found, and so that is good evidence at showing the

23  earliest point that it could have been found.

24          The defendants argue that TuneSat's processes were

25  instantaneous and, therefore, they could have found all of

P3EDArtO

| | |
|---|---|
| 1 | these or the majority of these infringements earlier.  But I'll |
| 2 | note for the Court that the 12 instances where the -- where |
| 3 | TuneSat found a match between plaintiffs' music and defendants' |
| 4 | content after the July 19, 2021, date, the majority of those |
| 5 | were due to a failure in the technology, and that's explained |
| 6 | in TuneSat's declaration.  The majority of them were from |
| 7 | TikTok, which is a social media site, and their automated |
| 8 | process -- |
| 9 | THE COURT:  I thought TikTok was an agent of the |
| 10 | Chinese government, but -- |
| 11 | MR. TRECHSEL:  Well, that's a question for bigger |
| 12 | minds than mine.  But the technology wasn't working |
| 13 | specifically with detecting those results, and I think a |
| 14 | non-diligent defendant or a non-diligent TuneSat would have let |
| 15 | that go, or just continued to run their process.  But, no, they |
| 16 | actually underwent manual review of each of these videos, not |
| 17 | just on behalf of plaintiffs, but all of their clients, and all |
| 18 | of the videos that they had taken from TikTok at the time, |
| 19 | which is a very extensive number. |
| 20 | It takes a lot of time, a lot of manpower, and they |
| 21 | discovered them relatively quickly I think under those |
| 22 | circumstances, the majority of them being found in December or |
| 23 | -- October, November, or December of 2021.  Obviously, within |
| 24 | the three years' window.  So, for those additional 12 uses that |
| 25 | are identified in defendants' briefing, the diligence was |

P3EDArtO

1    there, and they could not have found it earlier, because they

2    did run the technology at the time, and it failed to make the

3    detection.  That should not be held against the plaintiffs in

4    this matter.  They should not be penalized for attempting to

5    use a highly sophisticated piece of technology to discover

6    infringements, but then, if that technological process fails,

7    they're still held to the accrual data of when they had the

8    capabilities.

9            THE COURT:  Okay.  Thank you very much.

10            Let me hear rebuttal on this motion from defense

11    counsel, and then we'll turn to the other motion.

12            MR. PENDROFF:  Thank you, your Honor.

13            I want to address one thing counsel said, because it's

14    one of the issues we've asked for a ruling on.  He said, claims

15    don't accrue until actual notice.  So, in the papers, they've

16    argued none of the claims could have accrued until Kuhn law

17    firm determined there were actually infringements.

18            Now, lawyers, we like to think we're pretty important,

19    but we are not the arbiters of when the claims accrue.  In the

20    Second Circuit, copyright infringement accrues under the

21    discovery rule when a plaintiff knew or, in the exercise of

22    reasonable diligence, should have known.  So we'd like the

23    Court to at least determine as a matter of law that's the

24    standard to clarify things if we need to go to trial.

25            THE COURT:  Assuming that's the standard, I'll come

P3EDArtO

1    back to the question here, as I did on the other issue, why

2    isn't this a jury issue?

3              As I understand it, TuneSat discovered nearly 390,000

4    detections between January 2021 and July 2021, and of that huge

5    number, 21,000 were detections for Kobalt's music, the music

6    that Kobalt is asserting rights on.  And then, because there's

7    evidence that TuneSat's technology is fallible, you had to go

8    through this individualized assessment.  When you're talking

9    about 21,000, unless the jury buys into your claim, which is

10   disputed that it can be done like that, it can take a lot of

11   time.

12             So I'm mindful, also, of the more general proposition

13   that in every day tort law, due diligence or failure to

14   exercise due diligence is more often than not, much more often

15   than not a jury question.  So why isn't it a jury question

16   here?

17             MR. PENDROFF:  So, counsel made the point there were

18   problems with the detection technology with respect to the 12

19   accused uses that are in our second subset, but I don't think

20   there's any question, at least with respect to the 16 accused

21   uses, that these were found and matched.  Whether or not they

22   underwent quality control, I don't know if that's relevant,

23   because Mr. Woods was there, and Mr. Woods, on behalf of

24   TuneSat, said the date fingerprinted is the date that we can

25   connect the video to Kobalt.  And so all of those dates, the

1    date fingerprinted and the date found, are more than three

2    years before the complaint.  And, according to TuneSat, they

3    had enough information to connect the accused uses to Kobalt.

4              So, at that point, it's not really even a matter of

5    diligence.  We know, because they found those 16 --

6              THE COURT:  Okay.  What about the other group?

7              MR. PENDROFF:  So the other group, for them, at a

8    minimum, the videos were downloaded, so they had it in their

9    possession, and they also had all of the acoustic fingerprints.

10   All of these accused uses were on the internet by the time

11   these searches started running, and so if they had the videos

12   in their possession and they had the fingerprints in their

13   possession, the diligent search should have turned them up.

14             Now, they said there were problems with their

15   technology.  These are new declarations that I don't believe

16   we've heard any of this evidence before, and it seems like

17   these are somewhat self-searching declarations, right, trying

18   to --

19             THE COURT:  All right.  Were the people who were

20   making those assertions deposed?

21             MR. PENDROFF:  Yes, your Honor.

22             THE COURT:  Were they asked about this?

23             MR. PENDROFF:  I don't know if they were asked the

24   specific question as to whether they had any technical issues.

25             THE COURT:  Because if they weren't asked about it,

P3EDArtO

```
1    then I think I can consider their declarations.  If they were

2    asked about it, then they're bound by their depositions.

3    That's why I'm asking.  But I'll go back and look.

4              MR. PENDROFF:  Understood, your Honor.  And I think

5    certainly our real focus, as you can tell, we bifurcated the

6    groups of uses into the 16 and the 12, and I think, at a

7    minimum, it's claimed that the 16 uses should be barred by the

8    statute of limitations.

9              THE COURT:  Okay.  Let's shift gears to plaintiffs'

10   motion.  So let me hear first from plaintiffs' counsel.

11             MR. PENDROFF:  Thank you, Judge.

12             MR. TRECHSEL:  Thank you, your Honor.

13             Just as a preliminary matter, it appears that

14   plaintiffs have met their burden for direct copyright

15   infringement.  The issues of ownership and copying both appear

16   to be undisputed based on defendants' opposition, and it

17   appears that the key issues are with respect to some of their

18   remaining affirmative defenses.

19             We just spent a great deal of time on the statute of

20   limitations, so I don't know if I need to revisit that.

21             THE COURT:  Well, would there also be an issue on

22   willfulness?

23             MR. TRECHSEL:  Yes.  Absolutely.

24             THE COURT:  Again, that would be a jury question?

25             MR. TRECHSEL:  Well, it can be a jury question.  I
```

1  believe there is sufficient evidence to show their conduct was

2  willful.  The defendant --

3         THE COURT:  What about the -- I had the pleasure of

4  watching some of the video of this, which reminded me that I'm

5  basically a baseball fan, not a basketball fan, but it's one

6  thing where you have the song playing a central part of what's

7  being shown, like this one I saw where one of the players

8  himself is singing portions of the song.

9         MR. TRECHSEL:  Yes.

10         THE COURT:  It's something else where, as I understand

11  it, the song is being played in the background pursuant to a

12  license that did permit that; and now it's being used

13  differently, but it's just sort of background, if you will.

14  Couldn't a reasonable jury find that even if the first

15  infringement, first kind of infringement was willful, the

16  second kind was not?

17         MR. TRECHSEL:  Well, I think that all goes down to

18  whether defendants believed that they could use that music that

19  was licensed for the stadium, a public performance license in a

20  stadium, extended copying, and then displaying it on social

21  media.  And I don't believe that that is a reasonable belief

22  held by what is ostensibly a billion dollar or multi-billion

23  dollar entertainment company.  They tout their social media

24  presence online.  They testified that they had 5,900 posts a

25  month for Twitter alone.  You know, this is a company that

P3EDArtO

1   knows how to exploit its own intellectual property and should

2   have the knowledge to know exactly how and when it can use the

3   music of third parties.

4           THE COURT:  Yeah, but -- well, I guess I hear you, but

5   you don't think a jury could say, okay, the song is a central

6   part of the video, as it is in the first category, the --

7   you're going to use it, and you know you don't have permission,

8   copyright approval to use it.  You're really clearly acting

9   willfully.

10          If, on the other hand, it's just background and what

11  you're really showing is today's great place, or something like

12  that, highlights of a game, and, yes, there's some music

13  playing in the background, but it's coincidental, you know,

14  maybe they should have known; but more than should have, it

15  requires either actual intent or reckless disregard.

16          So, why isn't that at least a jury question?

17          MR. TRECHSEL:  Well, I can address that in two ways.

18  One, I think there's a distinction between the videos where the

19  music is in the background of -- there are three videos or,

20  actually, I think it's four, where it's in the background of

21  sort of a highlight reel or a preface of the game coming up and

22  describing a key match-up.  In those instances, that was edited

23  video, somebody taking clips of edited games, putting them

24  together, they had a voiceover, and they deliberately chose and

25  inserted that music.  So even in the background, that was a

P3EDArtO

1 conscious decision to use the music.  It wasn't -- I don't

2 believe that that is analogous to the other situation, which is

3 when it's in the stadium, and I believe there are six videos

4 where it comes up in that context, three of which or maybe more

5 are a fan shooting a half-court shot and making it the song

6 that plays.  It has the lyrics "it's going down."

7    THE COURT:  Yes.  It's more central.

8    MR. TRECHSEL:  Conferring the ball going down in the

9 bucket.

10    THE COURT:  Right.

11    MR. TRECHSEL:  So it does have context and is an

12 important part of the video.  And there's a reason they use

13 that particular song, and when they post it to social media,

14 they continue to use that specific song, because of its

15 relevance to the content in the video.  So --

16    THE COURT:  Okay.  And that's a good point, but let's

17 just take the first subgroup.

18    MR. TRECHSEL:  Sure.

19    THE COURT:  So, supposing the guy who put those clips

20 together takes the stand -- was he deposed, by the way?  Did

21 you depose whoever did the clips on that group of four?

22    MR. TRECHSEL:  No.  We deposed one person most

23 knowledgeable -- well, we deposed a 30(b)(6) witness, I should

24 phrase it that way, for Orlando.  And some of the employees who

25 created some of the videos are no longer there, others appear

P3EDArtO

1    to still be at the company.  And he did question one or two of

2    them, but not all of them.

3         THE COURT:  Well, did any one of the people you did

4    question -- and I'm talking about just that group of four.

5         MR. TRECHSEL:  Sure.

6         THE COURT:  I'm not talking about the ones where, in

7    effect, the music is symbolic of what is being showed, but just

8    the pure background and the real focus is on making the play.

9    Did anyone testify as to, along the lines of either, we didn't

10   even think about the music, because what we were focused on --

11   yes, in hindsight, maybe we should have excluded the music, but

12   it wasn't even in our thought processes.  First, someone who

13   said, yes, even there the music was important to conveying the

14   whole situation and the whole milieu, and so the music was

15   important.  Was there anything at all along those lines, either

16   way?

17        MR. TRECHSEL:  With respect to the four videos, they

18   are associated with the song "Type of Way."  I don't believe

19   that there was testimony in either direction as to those

20   particular videos.  The only testimony that we had with respect

21   to the specific choice of the music and where the music was

22   obtained were for the more recent posts.  There's a 2023 post

23   and a 2024 post, and those are ones where the deponent did have

24   a conversation with the person who created the video and

25   described where he obtained the music.  And that testimony is

P3EDArtO

1    presented in defendants papers, but, again, those are -- that

2    testimony was only relevant to those two most recent posts.

3    And, again, I would posit that despite their contention or

4    belief that they could use the music, I don't believe that that

5    belief was reasonable.  And they didn't undertake the effort to

6    determine if it was reasonable, and that amounts to

7    recklessness to plaintiffs' rights.

8         THE COURT:  Okay.  Let's hear from defense counsel.

9         MR. PENDROFF:  Thank you, your Honor.

10        I just want to clarify a couple of things, because I'm

11   not sure that counsel accurately reflected our position.

12   First, we're not conceding ownership at all.  In fact, there

13   are a number of fact issues in their papers where they failed

14   to connect A to B to C.

15        For example, they say, well, we have copyright

16   registrations, and that's prima facie evidence of ownership,

17   but those are attached to the declaration of Mr. Trumbull.  And

18   if you look at just the two copyright registrations attached,

19   none of the plaintiffs are listed.  And so there is no prima

20   facie evidence that plaintiffs' own songs, if they're not even

21   listed on the copyright registrations -- I think what

22   plaintiff's trying to do is put up a broad smoke screen, and we

23   need to look behind it and look at each individual song and

24   each individual plaintiff, and see whether they actually do own

25   them, because there's a question of whether these plaintiffs

P3EDArtO

1  even have standing to be here, because you have to either be an

2  owner or a beneficial owner of a right under a copyright, and I

3  don't think that they've proven any of those things,

4  particularly because they have defective declarations, late

5  declaration.  There are a number of technical issues, which of

6  course the Court can allow them to cure or overlook, but it

7  just leads to the overall point that they're not connecting all

8  the dots here.

9           And before ownership is decided as a matter of law, we

10  really need to look at the chain of custody, from the author to

11  the plaintiffs, and make sure that they actually do have

12  ownership.  In fact, the Notting Hill representative, Andy

13  McQueen, in his declaration, he didn't even say Notting Hill

14  has ownership.  And when we look at the agreement with the

15  artist, the artist still retains rights.  Well, so if the

16  artist still is retaining rights, there's no way that Notting

17  Hill can be the beneficial owner.

18           And that's not even to mention we don't know what

19  percentage of ownership plaintiffs are claiming.  In order to

20  bring a copyright infringement action, you have to have

21  exclusive rights.  Well, if they can't show they own

22  100 percent of the songs or have exclusive rights, and we know

23  that these songs, most of them at least, were co-authored by

24  other artists, and so there's nothing in the record that shows

25  what percentage ownership they have, and so I don't think we

P3EDArtO

1    can show ownership as a matter of law.

2            And then we get to infringement, and we're not

3    disputing use of the music in the videos, although one of them

4    is a little bit different, but we have a fair use defense, and

5    one of the factors in fair use, which the Supreme Court has

6    said is the most important factor, is the effect of the alleged

7    infringement on marketing.  There is zero evidence in the

8    record of what the market even is, let alone any effect on the

9    market.  In fact, plaintiffs don't have any evidence in the

10    record that any of these songs were ever really licensed.

11            So, as the Court did recently in the *O'Neil v.*

12    *Ratajkowski* case, the Court looks at it and says, I can't even

13    address this factor, because there is no evidence in the

14    record, and because I can't address this factor, I cannot rule

15    as a matter of law there was no fair use.  And if you can't

16    rule as a matter of law there was no fair use, there can't be a

17    ruling on the matter of law on infringement.

18            It also goes to three of the accused uses.  We don't

19    even know if they're subject to U.S. copyright law.  Defendant

20    believes that they're not.  They were created in Brazil by a

21    Brazilian contractor with whom Magic worked.  They were

22    uploaded in Brazil to Brazilian accounts.  So, those don't even

23    fall under U.S. copyright law --

24            THE COURT:  You're making a lot of good points, but so

25    one of the videos I looked at this morning has a song being

P3EDArtO

```
1    played prominently, and then an Orlando Magic player breaks out
2    and starts singing the song.  He did not resemble Enrico
3    Caruso, but, still, it was interesting.
4          So how could that be fair use?  This was in a video
5    promoting Orlando Magic.  So I understand the interesting fair
6    use issues to some of the other areas, but just taking that
7    one, how could that possibly be fair use?
8          MR. PENDROFF:  So I will say why I think it's fair
9    use, but at the outset, irrespective --
10         THE COURT:  No.  No.  I know you have all these other
11   points.  I was just focusing on the fair use --
12         MR. PENDROFF:  Right.  So that one I think is
13   transformative in the fact that the way it's being used, right,
14   they're not just using the song to try and -- first of all,
15   they're not using it to try and profit.  These are just fun
16   social media posts that are going up.
17         THE COURT:  Well, I'm not sure that is the end of the
18   story on profitability, because they're still promoting the
19   team.  They're not doing this just as an act of public
20   interest.  They have a motive to promote the team.  But, also,
21   I hear your point.
22         MR. PENDROFF:  Right.  And it's not just wholesale
23   copying without any change to the song.  The player is poking
24   fun at himself and poking fun at all the things in the song.
25         THE COURT:  You think it's a satire.
```

P3EDArtO

1          MR. PENDROFF:  I think there's a question as to

2     whether it is, and that should go to the jury.

3          THE COURT:  That's interesting.  I bet the player

4     didn't think he was acting in satirical fashion, but that's not

5     the issue.  Okay.

6          MR. PENDROFF:  And to the willfulness, your Honor is

7     100 percent right, there's a reason why plaintiffs are unable

8     to say one Second Circuit case where a Court has found willful

9     copyright infringement on summary judgment.  In fact, they

10    quote the *Island Software* case for the proposition willfulness

11    can be determined on a summary judgment, but, in fact, it

12    wasn't determined on a summary judgment there.

13          The Court said, it is not beyond -- and I like using

14    this word -- peradventure that a reasonable jury could find no

15    willfulness, because there was no evidence of knowing

16    infringement, which plaintiffs are not claiming here.  They're

17    claiming it was willful blindness or reckless, and that

18    requires inferences.  And at this stage, at the summary

19    judgment stage, all inferences should be drawn in the

20    non-movant's favor.  And that's why the *Island Software* said,

21    we can't find willfulness as a matter of law.  And there I

22    think the Court made pretty clear they thought there was

23    willfulness there, but because all inferences are drawn in the

24    defendants' favor, and it was possible that a reasonable jury

25    could say no willfulness, they couldn't say it as a matter of

P3EDArtO

1    law.  So, this is a question for the jury.

2                THE COURT:  All right.  Let me hear, finally, from

3    plaintiffs' counsel on this motion.

4                MR. TRECHSEL:  Thank you, your Honor.

5                Just with respect to the ownership issue, I believe

6    that plaintiffs have met their burden here.  The declarations

7    are sufficient, along with the agreements attached to them.

8                Defendants point to no specific provisions in the

9    agreement indicating that what was granted was insufficient for

10   standing.  They've had the agreements.  They have deposed the

11   declarants, or the majority of the declarants on the

12   agreements, at least those parties.  Plaintiffs have corrected

13   any deficiencies with respect to the declarations, and

14   particularly the declaration of Diana Sanders.  Plaintiffs have

15   now also provided the deposition testimonies showing she had

16   the firsthand knowledge with respect to each and every one of

17   the agreements.  The chain of title is there, particularly in

18   combination with the registrations, which almost all do list

19   the plaintiffs as claimants, and, in those that don't, the

20   authors are listed.  And those are the authors that are party

21   to the agreements that are also now on the record.

22               So, plaintiffs have provided evidence necessary to

23   show ownership, and I don't know what else, besides the

24   agreements themselves, that the party entering into the

25   agreement testifying that this is the agreement and the effect

P3EDArtO

1    of that agreement -- what more plaintiff could possibly provide

2    on those possible potential issues there.  When combined with

3    the registrations --

4         THE COURT:  Just to move it along, assuming that that

5    is correct, so I have a question -- well, two questions for

6    you:  Why isn't willfulness still an issue for the jury; and,

7    secondly, is fair use an issue for the jury?

8         MR. TRECHSEL:  Well, with respect to willfulness, the

9    Court can decide it, and your Honor, indeed, has decided

10   willfulness on a summary judgment motion in *Country Road v.*

11   *MP3.com*.  And the situation in that case was particularly

12   similar to this one, where the defendants, despite claiming

13   that it had the rights based on some other agreement, or had a

14   good faith belief that it could use the infringed work, the

15   Court found that that relief was unreasonable.  And based on a

16   number of the things that I've presented to you already, the

17   sophistication of the party, its knowledge about how the

18   licensing works, its lack of training of the people that were

19   actually creating the content, the --

20        THE COURT:  Well, I remember that case.  It was an

21   interesting case.  Of course I was just a kid when I decided

22   it.

23        What about fair use?

24        MR. TRECHSEL:  And on the issue of fair use, it is

25   defendants' burden to show the lack of impact on the

P3EDArtO

1  marketplace, not plaintiffs'.  This is an affirmative defense,

2  and they have not shown that they have not had an impact on the

3  market.

4         And the case *Grant v. Trump*, which is cited in our

5  reply papers, I think is right on point.  It's an extremely

6  analogous situation, where a song was used in that instance in

7  a political ad, but, again, content on social media, using a

8  song, the defendant in that case argued that they weren't

9  impacting the market; this was a political content, so it had a

10  distinct message; and it was transformative; and that it was

11  non-commercial, because it was for a political campaign and not

12  out to make money.  All of those particular arguments were

13  rejected by the Court in that case, and they should be rejected

14  here.

15         The licensing of music for content on social media is

16  clearly a market.  It's the way that many of these songwriters

17  make a living, and through this sync licensing of their music.

18  While the songs are very popular and the artists on them are

19  very popular, many of the song writers are not necessarily

20  known commodities.  And this is their bread and butter, this

21  type of sync licensing for the use of their music.  And that

22  opportunity was completely taken away from them.

23         One of the questions on that fourth factor that

24  defendants mentioned is if this content became pervasive, would

25  it destroy the market.  It absolutely would.  If any of the

P3EDArtO

1    companies can use music in any of its social media content,

2    that would be a huge blow to the music and sync licensing

3    business as a whole.

4            I mean, if you were to allow Johnson & Johnson,

5    Coca-Cola, McDonald's, everyone to do this, that would have an

6    enormous impact.  And it's defendants' burden to show that

7    their conduct would not have an impact and that -- they have no

8    evidence to show that, and it's not incumbent on plaintiff

9    necessarily to show what the market is and that there would be

10   an impact.

11           THE COURT:  Okay.  Well, I know there are other things

12   both of you could say, but we've gone an hour and I think

13   that's enough.  It's been very helpful to the Court.  I've got

14   a bunch of things I've got to review before I can decide this

15   motion, but I'm mindful of the trial date.

16           I will get you at least a bottom line decision, so

17   you'll know what, if anything, is going to trial, by no later

18   than Monday, March 31st.  I will get you a full opinion well

19   before the trial as well, but I won't set an exact date on

20   that.

21           So, out of curiosity, if the case were to go to trial,

22   at its maximum, if I decided nothing is being thrown out, and I

23   don't suggest for a moment that that's where I'm coming out,

24   but, hypothetically, how long of a trial would we be talking

25   about?

P3EDArtO

1          MR. PENDROFF:  I would think we're probably talking

2     about around five days, give or take.

3          THE COURT:  Okay.  Great.

4          MR. TRECHSEL:  I would agree with that.

5          MR. PENDROFF:  Your Honor, I understand argument is

6     over.  Could I clarify one quick thing in about two seconds?

7          THE COURT:  Yes.

8          MR. PENDROFF:  To refresh your recollection on the

9     *Country Road* case, you ruled that the defendant was estopped

10    from making -- or was estopped from making the -- sorry,

11    plaintiff was estopped from making a willfulness argument, not

12    that willfulness was proven as a matter of law.

13         THE COURT:  Your memory is better than mine.

14         MR. PENDROFF:  Well, I've had the benefit of good

15    people working with me.

16         THE COURT:  Very good.  I thank you both, and that

17    concludes this proceeding.

18              (Adjourned)

19

20

21

22

23

24

25